MARKMAN, J.
We granted leave to appeal to consider whether there was sufficient evidence to support plaintiffs claims of retaliatory discrimination and whether the “continuing violations” doctrine of Sumner v Goodyear Tire & Rubber Co, 427 Mich 505; 398 NW2d 368 (1986), should be preserved, modified, or abrogated in light of the language of the statute of limitations, MCL 600.5805(1). The jury found that plaintiff was not discriminated against on the basis of national origin, but was retaliated against on the basis of either her opposition to sexual harassment or because she filed a grievance claiming national-origin discrimination. The Court of Appeals affirmed. Because we conclude that, once, evidence of acts that occurred outside the statute of limitations period is removed from consideration, there was insufficient evidence of retaliation based on either plaintiffs alleged opposition to sexual harassment or her filing of a grievance, we reverse the judgment of the Court of Appeals and remand to the trial court for entry of a judgment in favor of defendant. In so holding, we overrule the “continuing violations” doctrine of Sumner, supra, as inconsistent with the language of the statute of limitations, MCL 600.5805(1) and (10). As a result, we do not reach the other issues raised on appeal or the issues raised in plaintiffs cross-appeal.
*267 i. pacts and procedural history
Plaintiff Sharda Garg is of Asian Indian ancestry. She began her employment as a staff psychologist with defendant Macomb County Community Mental Health Services in 1978. Plaintiff testified that Donald Habkirk, the director of defendant’s disability section, which included the facility where plaintiff worked, had during 1981 engaged in what plaintiff characterized as “sexually harassing” behavior with female coworkers. Specifically, plaintiff observed Habkirk pull one coworker’s bra strap and snap the elastic panties of another. Plaintiff acknowledges that she herself was never treated in this manner or otherwise sexually harassed, and that she never reported to anyone the incidents she allegedly observed. Habkirk denied engaging in such conduct.
At “around the same time,” plaintiff, while walking down an office corridor, felt someone’s hand touch her upper back, near her shoulder. Plaintiff reacted as follows: “I felt somebody touching me, and I just turned around and swung at him.” She farther observed, “it was a very automatic reaction on my part.” It was only after she hit this person that she realized it was Habkirk whom she had hit. She and Habkirk stared at each other for a moment before she proceeded into her office. Plaintiff did not file a grievance, tell anyone about the incident, or offer any explanation to anyone regarding why she had struck Habkirk. In response to a question concerning whether the touching was “improper,” plaintiff did not characterize it as such.
While Habkirk never took any formal action against plaintiff for striking him, and indeed testified that he could not even remember the incident, plaintiff claims that her formerly cordial relationship with Habkirk deteriorated as he became increasingly cold and distant. *268 While plaintiff generally enjoyed a good employment relationship with defendant and its management initially, she asserted that she began to perceive changes in this relationship following the touching incident. After six years of being rated as either “outstanding” or “very good,” plaintiffs 1983 performance review was downgraded to “satisfactory.” It was also at this point that plaintiff applied for several job promotions, in each case unsuccessfully. The first position she applied for in 1983 was given to someone from outside the organization, despite a general inclination by defendant in favor of internal promotions. Two other promotion applications in 1983 were also rejected. Over the next three years, plaintiff applied unsuccessfully for four more promotions. Plaintiff was denied a total of eighteen promotion opportunities, including eleven during the period of 1983 through 1987. During this period, Habkirk always served in plaintiffs chain of command. Once at a dinner party with plaintiffs immediate supervisor, Robert Slaine, plaintiffs husband asked why plaintiff had not been promoted. Slaine responded that, in his opinion, it was because Habkirk did not like plaintiff. Slaine denied making this statement, and Habkirk denied telling Slaine that he disliked plaintiff.
In 1986, Kent Cathcart was chosen by Habkirk as the new program director in plaintiffs facility. However, little changed for plaintiff because she failed to receive any of the next three promotions for which she applied. In December 1986, she was denied a promotion in favor of a contract employee with less seniority. Following this rejection in February 1987, plaintiff filed her first promotion-related grievance with the union representing defendant’s employees. When plaintiff was again denied a promotion in early 1987, this time in favor of a person from outside the company, she filed a second *269 promotion-related grievance with the union in June 1987, alleging that the denial was due to discrimination based on her national origin and color. The grievance was forwarded to Cathcart, and was denied without investigation. Plaintiff next applied for a promotion in 1989, but was again denied. Plaintiff was denied seven promotions during the period of 1989 through 1997.
Plaintiff claims that the “retaliation” against her for filing these grievances also took the form of poor overall treatment by defendant. Specifically, she claims that Cathcart, and the two supervisors who succeeded Cathcart after plaintiff was transferred to defendant’s First North facility in 1995, treated her “in a degrading and humiliating manner.” Plaintiff claims that Cathcart would criticize her for not participating in agency activities, but would then deny her requests to participate in meetings, conferences, and committees. In addition, plaintiff testified that Cathcart would reprimand her for being even two minutes late for work, but would let her coworkers “come and go as they pleased.” Plaintiff also testified that Cathcart once chastised her for going outside to look at a rainbow, but that her coworkers were routinely allowed to go outside for cigarette breaks on company time. Cathcart also refused to give her keys to the facility. Finally, when she moved to First North, plaintiff was given an office that was formerly a storage closet. The office was uncarpeted and had no windows. In addition, it was located next to a bathroom, forcing plaintiff to hear “people defecating and urinating” throughout the day. Plaintiff was assigned to this office despite her seventeen years of seniority and the availability of more desirable office spaces.
*270 Plaintiff also claims that Cathcart demonstrated a predisposition against “people of color” during the period that she was employed by defendant under his supervision. Specifically, plaintiff testified regarding four separate displays of this predisposition. First, when Cathcart learned that plaintiffs son had been accepted to medical school, he allegedly stated that “there are enough Indian doctors already.” Second, Cathcart allegedly complained about the accent of an Indian psychiatrist, stating that “these people have been here long enough, they ought to speak good English.” Third, Cathcart allegedly stated that he would not have hired an African-American nurse if a white candidate had been available. Finally, Cathcart allegedly used a racially derogatory term when referring to African-Americans. Cathcart denies making any of these statements.
On -July 21,1995, plaintiff brought this action under the Civil Rights Act, MCL 37.2101 et seq., claiming that her promotion denials and poor treatment were due to national-origin discrimination and were in retaliation for engaging in activities protected by the aGt. Plaintiff originally claimed retaliatory discrimination based solely on the union grievance claiming national-origin discrimination. She later amended her complaint to allege that she was also retaliated against for opposing sexual harassment. Defendant denied the allegations and asserted that some of the allegations were barred by the three-year period of limitations. MCL 600.5805(1) and (10). Defendant moved for partial summary disposition on that basis, but the trial court denied the motion, citing the “continuing violations” doctrine adopted in Sumner.
Following a three-week trial, the jury found that plaintiff was not discriminated against because of na *271 tional origin or color. However, the jury also found that defendant had retaliated against plaintiff because she “opposed sexual harassment or because she filed a complaint or charge about being discriminated against.” The jury awarded plaintiff $250,000 in damages.
Defendant filed a motion for judgment notwithstanding the verdict or a new trial. The trial court noted that “physical acts can convey a message better than words,” and that plaintiffs physical response to the touching by Habkirk was sufficient to inform defendant that she opposed Habkirk’s sexually harassing behavior. The trial court further held that sufficient evidence was presented to allow a reasonable juror to find a causal connection between plaintiffs striking Habkirk and her failure to be promoted. Because the evidence supported at least one of the retaliation theories, defendant’s motion was denied. In an unpublished opinion, the Court of Appeals affirmed the jury’s verdict. Unpublished opinion per curiam of the Court of Appeals, issued March 29, 2002 (Docket No. 223829). The Court of Appeals held that the “continuing violations” doctrine allowed the introduction of factual allegations going back more than three years before plaintiff filed her lawsuit and thus the statute of limitations was not a bar to the facts plaintiff presented to the jury. With regard to the merits, the Court of Appeals held that when plaintiff struck Habkirk, a reasonable juror could have concluded that she “ ‘raise[d] the specter,’ ” quoting Mitan v Neiman Marcus, 240 Mich App 679, 682; 613 NW2d 415 (2000), that she was opposing Habkirk’s sexual harassment. The Court of Appeals also determined that there was sufficient evidence to allow a reasonable juror to conclude that plaintiff established both of her retaliation claims.
*272 After this Court directed the parties to present oral argument on whether to grant leave to appeal or take other action permitted by MCR 7.302(G)(1), 469 Mich 983 (2003), and having heard such argument, we granted defendant’s application for leave to appeal, directing briefing regarding whether the “continuing violations” doctrine of Sumner was consistent with the statute of limitations, MCL 600.5805(1). 469 Mich 1042 (2004).
II. STANDARD OF REVIEW
The denial of a motion for judgment notwithstanding the verdict is subject to review de novo. Sniecinski v Blue Cross & Blue Shield of Michigan, 469 Mich 124, 131; 666 NW2d 186 (2003). Reversal is permitted only if the evidence, while viewed in a light most favorable to plaintiff, fails to establish a claim as a matter of law. Wilkinson v Lee, 463 Mich 388, 391; 617 NW2d 305 (2000). Whether the “continuing violations” doctrine is consistent with MCL 600.5805(1) and (10) is a question of law that we review de novo. Jenkins v Patel, 471 Mich 158, 162; 684 NW2d 346 (2004).
III. ANALYSIS
The issue in this case is not whether plaintiff was treated poorly or insensitively by defendant. Nor is it whether defendant “retaliated” against plaintiff for her conduct in hitting Habkirk. Instead, the issue is whether defendant retaliated against plaintiff specifically for conduct on her part protected by the Civil Rights Act. MCL 37.2701 provides, in pertinent part:
Two or more persons shall not conspire to, or a person shall not:
*273 (a) Retaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act.
To establish a prima facie case of retaliation, a plaintiff must show:
(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. [DeFlaviis v Lord & Taylor, Inc, 223 Mich App 432, 436; 566 NW2d 661 (1997).]
A. RETALIATION BASED ON OPPOSITION TO SEXUAL HARASSMENT
Plaintiffs first theory is that defendant retaliated against her because she opposed Habkirk’s sexual harassment. At “around the same time” that plaintiff allegedly observed sexually harassing behavior by Habkirk toward female employees, she felt someone touch her on the back, near her shoulder, while she was walking near Habkirk’s office.[1] Plaintiff testified that “I felt somebody’s hand touching me, and I turned around and hit the person.” She noted further that “it was a very automatic reaction on my part. I felt somebody touching me, and I just turned around and swung at him.”
*274 We conclude there is insufficient evidence for a juror reasonably to conclude that by striking Habkirk under these circumstances plaintiff was opposing sexual harassment, i.e., engaging in a “protected activity” under the Civil Rights Act. First, plaintiff acknowledged that Habkirk was not sexually harassing her at the time she hit him so that it is difficult to view her conduct as responsive to “protected activity.” This is underscored by plaintiffs acknowledgment that Habkirk had never sexually harassed her. Second, there is no evidence that, before this lawsuit, plaintiff ever sought to cast her conduct in hitting Habkirk in terms of opposing sexual harassment at defendant’s workplace. Such a message was never communicated to the alleged victims of Habkirk’s sexual harassment or to fellow employees, much less to Habkirk, management, union representatives, or public agencies. Third, plaintiff testified that she did not even know it was Habkirk who touched her shoulder until after she struck him. That is, because plaintiff in her “automatic” response to the touching could just as likely have struck out at any one of her coworkers as at Habkirk, it is difficult to conclude that her action was somehow intended to communicate a principled opposition to prior incidents of supervisory misconduct. That is, there is simply no connection here between cause — the alleged sexual harassment — and effect — plaintiffs striking Habkirk.[2]
*275 Moreover, although it is not necessary to our analysis in this case, even if plaintiff were indisputably responding to past sexual harassment by hitting Habkirk, we are not prepared to conclude that any response to conduct prohibited by the Civil Rights Act, no matter how excessive or inappropriate the response, including assaultive behavior, falls within the act’s protections. An employee is not immunized for any type of responsive conduct, no matter how outrageous or disproportionate, simply because it is connected with opposition to discrimination. Obviously, no employee would be protected under the act from all “retaliation” by an employer for criminal, or sabotaging, or destructive activities simply because these occurred in response to perceived employer discrimination. For purposes of analysis under § 701(a), consideration must be given to separating the motivation underlying an employee’s conduct and the means by which such motivation is translated into conduct.
Under these circumstances, we conclude that no juror could have reasonably concluded that defendant was engaged in a “protected activity” by opposing sexual harassment when she hit Habkirk.
Even if the jury here were persuaded that plaintiff was engaged in a “protected activity” by striking Habkirk, she has failed to show that defendant knew that she was engaged in such activity. Absent such a showing, there could be no “retaliation” on the employer’s part to anything within the protection of the Civil Rights Act. While Habkirk obviously would have been aware that plaintiff had struck him, there was nothing inherent in this conduct that would have apprised him that plaintiff was thereby opposing sexual harassment. There is no evidence that Habkirk touched plaintiff at that time (or any other time) in a way that was *276 inappropriate; there is no evidence that plaintiff herself perceived that Habkirk touched her in a way that was inappropriate; there is no evidence that Habkirk reasonably could have discerned from the nature of plaintiffs response to his touching that she was communicating any message of opposition to sexual harassment; and there is no evidence that plaintiff at any time explained the “significance” of her behavior to Habkirk.
Nor is there anything else on the part of plaintiff following this incident that would communicate to anyone how she had been opposing sexual harassment by striking Habkirk. To the extent that she failed to communicate this supposed purpose to alleged victims of Habkirk’s previous conduct, to coemployees, to management, to union representatives, to public authorities, or to Habkirk himself,[3] it is difficult to understand how defendant could have been sufficiently aware that plaintiff was engaged in “protected” activity so as to be able to “retaliate” against her for such conduct.
Under these circumstances, we conclude that no juror could reasonably have concluded that defendant was aware that plaintiff had been engaged in “protected activity” by opposing sexual harassment when she hit Habkirk.
Therefore, on the basis either that there is insufficient evidence that plaintiff was engaged in protected activity[4] or that defendant could have been aware of such activity, plaintiff has failed to establish a claim *277 under the Civil Rights Act. To the extent that she has failed to present sufficient evidence that she was engaged in protected activity, she has failed to satisfy the threshold requirement for coverage under § 701(a); to the extent that she has failed to present sufficient evidence that defendant could have been aware of such activity, she could not have been the object of “retaliation” under § 701(a).[5]
B. RETALIATION BASED ON FILING A GRIEVANCE
Plaintiffs second theory is that defendant retaliated against her after she filed a grievance claiming national-origin discrimination. After being refused a promotion for the eleventh time, plaintiff filed a grievance with her union in June 1987, claiming that she was being denied promotions because of discrimination based on national origin and color. Plaintiff claims that, as a result of filing the grievance, she was denied subsequent promotion opportunities and was subjected to poor treatment in general by Cathcart and the First North supervisors. With regard to this claim, it is undisputed that plaintiff engaged in a protected activity, namely filing a grievance claiming a violation of the Civil Rights Act. In addition, it is undisputed that
*278 defendant was aware that plaintiff had engaged in this activity. Plaintiff presented testimony that defendant’s retaliatory conduct took place over an eleven-year period, including acts that took place after she filed the instant action on July 21, 1995. Defendant argues that, pursuant to the three-year period of limitations, any claim based on acts occurring before July 21, 1992, is barred. MCL 600.5805(10). Despite the statute of limitations, both the trial court and the Court of Appeals permitted plaintiff to recover on the basis of untimely acts, or acts occurring before July 21, 1992, under the so-called “continuing violations” doctrine adopted in Sumner. We conclude that, absent evidence of these acts, there is insufficient evidence to establish a causal link between the 1987 grievance and any retaliatory acts occurring within the limitations period.
The “continuing violations” doctrine was first addressed by this Court in Sumner, supra at 510. We began our analysis in that case by stating that it is “appropriate... in discrimination cases [to] turn to federal precedent for guidance in reaching our decision.” Id. at 525. We found particularly helpful the considerations relied on by federal courts in nullifying the statute of limitations in Title VII of the Civil Rights Act of 1964. 42 USC 2000e et seq. We described these as follows:
First, [the Civil Rights Act] is a remedial statute whose purpose is to root out discrimination and make injured parties whole. Second, employees are generally lay people, who do not know that they must act quickly or risk losing their cause of action. An employee may fear reprisal by the employer, or may refer the matter to a union, which may not take any action within the limitation period. Employees may also delay filing their complaints in the hope of internal resolution or simply to give the employer a second chance. Third, and most importantly, many discriminatory *279 acts occur in such a manner that it is difficult to precisely define when they took place. One might say that they unfold rather than occur. [Sumner.; supra at 525-526].[6]
Sumner also found persuasive the United States Supreme Court’s decision in United Air Lines, Inc v Evans, 431 US 553; 97 S Ct 1885; 52 L Ed 2d 571 (1977). In Evans, the United States Supreme Court for the first time addressed the “continuing violations” doctrine that had been created by the lower federal courts in order to overcome the statute of limitations.[7] The employee in Evans, a flight attendant with United Air Lines, was fired in 1968 on the basis of a “no marriage” rule that was later found to violate Title VIL She was rehired by the airline in 1972, but was not credited for her pre-1968 service and, therefore, was treated as a new hire for seniority purposes. The employee argued that the airline’s refusal to recognize her past service constituted a “present effect to the past illegal act and *280 therefore perpetuates the consequences of forbidden discrimination.” Id. at 557. Therefore, she alleged that the “continuing violations” doctrine should be applied to allow her to obtain relief for the now-untimely 1968 firing. However, the United States Supreme Court held that merely demonstrating a “present effect to a past act of discrimination” is insufficient to create a continuing violation. Id. at 558. “[T]he emphasis should not be placed on mere continuity; the critical question is whether any present violation exists.” Id. Therefore, in order to support a discrimination claim on a “continuing violations” theory, an employee must first demonstrate the existence of a present violation. Since the employee in Evans was unable to demonstrate any violation within the time limitations of Title VII, her claim was barred as untimely.
Sumner found the federal precedent persuasive and held that the “continuing violations” doctrine applied to claims under both the Civil Rights Act and the Handicappers’ Civil Rights Act, MCL 37.1101 et seq. This Court adopted the Evans requirement that an employee must first demonstrate that a violation has taken place within the limitations period. Sumner, supra at 536. Once an employee has demonstrated this, he or she must then demonstrate either that his or her employer has engaged in a “policy of discrimination” or has engaged in “a series of allegedly discriminatory acts which are sufficiently related so as to constitute a pattern . ...” Id. at 528. There are three factors to consider in determining whether an employer has been engaged in a series of allegedly discriminatory acts:
“The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more *281 in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee’s awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?” [Sumner, supra at 538, quoting Berry v LSU Bd of Supervisors, 715 F2d 971, 981 (CA 5, 1983).]
Whatever the merits of the policy crafted by Sumner, it bears little relationship to the actual language of the relevant statute of limitations, MCL 600.5805, and MCL 600.5827. Fundamental canons of statutory interpretation require us to discern and give effect to the Legislature’s intent as expressed by the language of its statutes. DiBenedetto v West Shore Hosp, 461 Mich 394, 402; 605 NW2d 300 (2000). If such language is unambiguous, as most such language is, Klapp v United Ins Group Agency, Inc, 468 Mich 459; 663 NW2d 447 (2003), “we presume that the Legislature intended the meaning clearly expressed — no further judicial construction is required or permitted, and the statute must be enforced as written.” DiBenedetto, supra at 402.
MCL 600.5805 provides, in pertinent part:
(1) A person shall not bring or maintain an action to recover damages for injuries to persons or property unless, after the claim first accrued to the plaintiff or to someone through whom the plaintiff claims, the action is commenced within the periods of time prescribed by this section.
*
(10) The period of limitations is 3 years after the time of *282 the death or injury for all other actions to recover damages for the death of a person, or for injury to a person or property.
MCL 600.5827 provides that a “claim accrues at the time the wrong upon which the claim is based was done regardless of the time when damage results.” Thus, § 5805 requires a plaintiff to commence an action within three years of each adverse employment act by a defendant. Section 5805 does not say that a claim outside this three-year period can be revived if it is somehow “sufficiently related” to injuries occurring within the limitations period. Rather, the statute simply states that a plaintiff “shall not” bring a claim for injuries outside the limitations period. Nothing in these provisions permits a plaintiff to recover for injuries outside the limitations period when they are susceptible to being characterized as “continuing violations.” To allow recovery for such claims is simply to extend the limitations period beyond that which was expressly established by the Legislature.[8]
*283 An additional flaw in Sumner’s reasoning is its unduly heavy reliance on federal case law, particularly Evans. While federal precedent may often be useful as guidance in this Court’s interpretation of laws with federal analogues, such precedent cannot be allowed to rewrite Michigan law. The persuasiveness of federal precedent can only be considered after the statutory differences between Michigan and federal law have been fully assessed, and, of course, even when this has been done and language in state statutes is compared to similar language in federal statutes, federal precedent remains only as persuasive as the quality of its analysis. Here, not only does the “continuing violations” doctrine in Michigan conflict with the requirements of §§ 5805 and 5827, but, at least arguably, the federal doctrine is given affirmative support by language in Title VII that is absent from the Civil Rights Act. In 1972, Congress amended Title VII to extend the period within which an employee must file a complaint with the Equal Employment Opportunity Commission from 90 days to 180 days. At the same time, Congress imposed a two-year limit on back pay awards. Thus, Congress implicitly recognized an employee’s right to recover damages for discriminatory acts beyond those that occurred within the 180-day period. Sumner noted that such amendment constituted an “implicit endorsement of the continuing violation theory,” because Congress allowed employees to recover damages for discriminatory acts beyond those that occurred within the 180-day period. Sumner, supra at 526. However, Sumner failed to note that there is no corresponding provision in Michigan law *284 that even implicitly endorses the “continuing violations” doctrine. Thus, rather than supporting Sumner’s holding, the existence of the federal statute leads to the opposite conclusion — that the “continuing violations” doctrine is contrary to Michigan law and, therefore, that federal precedent should not have been imported into Michigan law.[9]
Therefore, we overrule Sumner and hold that a person must file a claim under the Civil Rights Act within three years of the date his or her cause of action accrues, as required by § 5805(10).[10] That is, “three years” means three years. An employee is not permitted to bring a lawsuit for employment acts that accrue beyond this period, because the Legislature has deter *285 mined that such claims should not be permitted.[11] Whether or not the “continuing violations” exception of Sumner constitutes a useful improvement in the law, there is no basis for this Court to construct such an amendment.[12]
*286 Accordingly, plaintiffs claims of retaliatory discrimination arising from acts occurring before June 21,1992, are untimely and cannot be maintained. Without these untimely acts, plaintiffs claim is limited to acts occurring five to eleven years[13] after she filed her grievance. In light of this gap, there is insufficient evidence to allow a reasonable juror to find a causal link between the 1987 grievance and the discriminatory acts falling within the limitations period.
Furthermore, in order to show causation in a retaliatory discrimination case, “[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action.” West v Gen Motors Corp, 469 Mich 177, 186; 665 NW2d 468 (2003). There is no evidence to suggest any distinction between the promotion denial that occurred while plaintiff was in Cathcart’s chain of command and those denials involving supervisors who had no knowledge of plaintiffs grievance. Five supervisors, including four who were directly responsible for postgrievance promotion decisions involving plaintiff, testified that they were unaware that plaintiff had filed any grievance. Plaintiff failed to introduce any evidence to contradict that testimony. However, despite the First North supervisors’ lack of knowledge about the grievance, they treated her requests for promotions in the same manner that Cathcart did, i.e., they denied them. Because these supervisors were not aware of the grievance, they could not have “retaliated” against plaintiff for its filing. Further, there is no evidence that plaintiffs job qualifications changed in any meaningful way in the *287 time between the denial by Cathcart and the denials by the other supervisors at First North. Thus, a juror could not reasonably conclude that the reasons behind the denials within First North were related to the grievance.
Plaintiff has failed to produce evidence affirmatively showing, as is her burden, that the reasons underlying the promotion denial involving Cathcart were any different from the denials involving supervisors who were unaware that plaintiff had filed a grievance. West, supra at 183-184; DeFlaviis, supra. It appears that both the trial court and the Court of Appeals identified a “causal connection” between the grievance and the promotion denials simply on the basis of timing — that is, because the denials occurred after the grievance, there must be a functional relationship. This is the kind of post hoc, ergo propter hoc reasoning rejected in West. We reject such reasoning in this case as well.
Similarly, plaintiff failed to establish that she was treated poorly by Cathcart and the First North supervisors as a result of the grievance. Plaintiff was unable to establish that Cathcart’s treatment of plaintiff was distinguishable in any way from her treatment by supervisors who were unaware of the grievance.[14]
First, plaintiff claimed that Cathcart treated her differently from other employees by refusing to give her a key to the facility. However, her supervisor at First North, who denied any knowledge of the grievance, similarly refused to give plaintiff a key. Second, plaintiff claimed that her work was subjected to greater scrutiny *288 by Cathcart than that of her coworkers. However, she also claimed that another First North supervisor, who is no longer an employee of defendant and did not testify, wrote her several memos a day “unfairly attacking” her performance. Finally, both plaintiff and the Court of Appeals found it noteworthy that she was moved to a “disgusting” office after the transfer to First North. However, the supervisor who assigned her that office testified that he was unaware of the grievance and had informed her that it was only a temporary situation. Under these circumstances, we conclude that no juror could have reasonably concluded that plaintiff was subjected to poor treatment because she had been engaged in “protected activity” by filing a grievance claiming national-origin discrimination.
Finally, plaintiff has failed to demonstrate that Cathcart’s alleged derogatory comments based on national origin establish any causal connection between the grievance and the adverse employment action. In order to establish such a connection, plaintiff needed to show that the comments demonstrated Cathcart’s discriminatory animus toward her and that, as a result of such animus, Cathcart retaliated against her for filing the grievance.
Plaintiff claims that Cathcart made a racially derogatory statement regarding Indians.[15] Plaintiff testified that Cathcart responded to the news that her son had *289 been admitted to a medical program by stating, “I don’t know how many Indian doctors we need.”[16] This statement does not pertain in any way to the promotion process; neither is it directed toward plaintiff in terms of evaluating her work performance or threatening any future treatment of her. See Sniecinski, supra at 136 n 8. However inappropriate or ill-informed this statement, it is better characterized, in our judgment, as a “stray comment” than as reflective of any “pattern of biased comments ... .”[17] Id.
More to the point, for the same reason that plaintiff here has failed to demonstrate that Cathcart’s treatment of her did not vary in any appreciable way from her treatment by other supervisors — concerning whom there is no evidence of even such “stray comments” — we do not believe that plaintiff has demonstrated that she was subjected to denials of promotions or otherwise poor treatment by defendant on the basis of her grievance. Again, we reiterate that the question is not the propriety or seemliness of Cathcart’s statements, but merely whether such statements establish a causal link between plaintiffs grievance and her subsequent treatment by defendant.
In light of insufficient evidence that plaintiff was not promoted or otherwise treated poorly because she engaged in a “protected activity,” i.e., having filed a grievance against defendant alleging national-origin discrimination, plaintiff has failed to establish a retaliation claim under the Civil Rights Act.
*290 IV CONCLUSION
We conclude that the “continuing violations” doctrine is contrary to the language of § 5805 and hold, therefore, that the doctrine has no continued place in the jurisprudence of this state. Accordingly, Sumner is overruled. Further, we conclude that there is insufficient evidence to support plaintiffs claims of retaliation based on her opposition to sexual harassment and those acts by her employer following the grievance that were within the statutory hmitations period. Accordingly, we reverse the judgment of the Court of Appeals and remand the matter to the trial court for entry of judgment in favor of defendant.
Taylor, C.J., and Corrigan and Young, JJ., concurred with MARKMAN, J.

 Plaintiff argued at oral argument before this Court that it was significant that she was passing a room Habkirk had just occupied, because it demonstrates that she “knew” it was Habkirk who touched her. However, she testified several times that she felt “somebody” touch her back, that she “didn’t know who was in behind [her],” and that she simply “swung at whoever it was behind [her].” (Emphasis added.)

 This lack of connection is underscored by plaintiffs own testimony that the incidents of sexual harassment that allegedly prompted her opposition occurred only at “about the same time” that she struck Habkirk. Although we acknowledge that a reasonable juror would be entitled to conclude that this characterization is compatible with incidents of sexual harassment preceding plaintiffs hitting Habkirk, the lack of a clear temporal relationship between the cause and the effect does not well serve plaintiffs argument.

 Nor did plaintiff discuss Habkirk’s alleged inappropriate behavior itself with any of these parties.

 We do not agree with the Court of Appeals that plaintiff here has raised any specter that she was engaged in opposition to sexual harassment by her conduct.

 Had plaintiff presented sufficient evidence with regard to these matters, i.e., shown both that she had been engaged in a protected activity and that defendant had been aware of this, she would still have been required to demonstrate that she suffered an adverse employment action as a result of her engaging in the protected activity, i.e., that there was some nexus or causal connection between the adverse employment action and the protected activity. See DeFlaviis, supra; West v Gen Motors Corp, 469 Mich 177, 186; 665 NW2d 468 (2003) (applying the antiretaliation provisions of the Whistleblowers’ Protection Act, MCL 15.361 et seq.). See also Shallal v Catholic Social Services of Wayne Co, 455 Mich 604, 617; 566 NW2d 571 (1997) (noting that “ ‘whistleblower statute[s] [are] analogous to antiretaliation provisions of other employment discrimination statutes ...’” [citation omitted]).

6 While it is not necessary to our analysis in this case, we note that the operation of our statute of limitations at least partially undercuts the significance of the factors cited by Sumner. In Michigan, an employee does not have to “act quickly or risk losing their cause of action” under the state Civil Rights Act but has up to three years to assert a claim in contrast to the 180 days allowed under Title VII. This extended period would also presumably accord an employee sufficient time to seek “internal resolution or simply to give the employer a second chance” without endangering her claim. Further, at least some reasonable observers might presume the three-year limitations period accords an employee sufficient time to determine that a discriminatory act has truly “unfolded.”

 See, e.g., King v Georgia Power Co, 295 F Supp 943, 946 (ND Ga, 1968) (holding that “[t]he failure to allege that the complaint was filed with the EEOC [Equal Employment Opportunity Commission] within 90 days of the alleged unfair employment practices is of no importance, for the violations of Title VII alleged in the complaint may be construed as ‘continuing’ acts”); Bartmess v Drewrys USA, Inc, 444 F2d 1186, 1188 (CA 7, 1971) (holding that “the ninety day limitation is no bar when a continuing practice of discrimination is being challenged rather than a single, isolated discriminatory act”).

 The dissent is utterly deconstructionist in its attitude toward statutes of limitations, which is its right but which attitude nonetheless bears no relationship to that of the Legislature. We are told by the dissent, for example, that we often cannot determine when discriminatory acts have taken place, when civil rights claims have accrued or manifested themselves, whether an act of discrimination is “discrete or nondiscrete,” and that even discrete acts of discrimination may not be readily identifiable. Post at 298. Doubtless, there are difficult evidentiary issues in the realm of civil rights as in most other realms of the law. Such difficulties, however, do not constitute authorization for ignoring the express direction of the Legislature that violations of the Civil Rights Act are to be subject to a period of limitations, one that is 2% years longer than the federal period of limitations. The dissent is obviously correct that the cost of a statute of limitations is that some acts of discrimination will go unredressed. This is the cost of any statute of limitations, but nonetheless a cost that the Legislature apparently believes is outweighed by the benefits of setting a deadline on stale claims. While the dissent may be *283 correct that the “continuing violations” doctrine “better protects” the victims of discrimination, post at 299, and that it is a “highly workable and preferable” doctrine, post at 300, it is not the doctrine chosen by the Legislature.

 We note that the United States Supreme Court recently rejected the “continuing violations” doctrine for Title VII claims with regard to discrete acts because it is contrary to the statute of limitations. Nat’l R Passenger Corp v Morgan, 536 US 101; 122 S Ct 2061; 153 L Ed 2d 106 (2002).

 Although we concur with the dissent that the doctrine of stare decisis constitutes “ ‘the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes t'o the actual and perceived integrity of the judicial process,’ ” post at 297, quoting Robinson v Detroit, 462 Mich 439, 463; 613 NW2d 307 (2000), so also are these values promoted by the separation of powers doctrine, which holds that it is the responsibility of the judiciary to respect the intentions of the Legislature by giving faithful meaning to the words of the law. In this case, we conclude that the values identified in Robinson, and invoked by the dissent, are substantially better served by restoring the law to its written meaning rather than maintaining the judicial amendments of Sumner. Not only, in our judgment, are laws generally made more “evenhanded, predictable and consistent” when their words mean what they plainly say, and when all litigants are subject to the equal application of such words, but laws are also made more accessible to the people when each of them is able to read the law and thereby understand his or her rights and responsibilities. When the words of the law bear little or no relationship to what courts say the law means (as in Sumner), then the law increasingly becomes the exclusive province of lawyers and judges.

 The principal difference between the majority and the dissent in approaching the interpretative process is that the majority is content to rely on the actual words used by the Legislature while the dissent insists on ascribing its own “purpose” to the act, post at 302 n 6, and interpreting the act consistent with this statement of purpose, no matter what barriers to this end have been inconveniently created by the Legislature in failing to use words that serve the dissent’s self-stated “purpose.” While it can scarcely be gainsaid that the purpose of the Civil Rights Act is “to root out discrimination and make injured parties somewhat whole,” id., that purpose must be understood in the context of a competing “purpose” to ensure that relief under the act be subject to a statute of limitations. While the dissent apparently views a statute of limitations as compromising the act’s “purpose,” i.e., its own characterization of such purpose, we believe that it is better understood as requiring a more precise and fine-tuned statement of the act’s purpose, one predicated on the intentions of the Legislature rather than on the preferences of the dissent. The words of any statute can be effectively undermined by a sufficiently generalized statement of “purpose” that is unmoored in the actual language of the law.

 This Court has rejected similar attempts to modify statutes of limitations. See Boyle v Gen Motors Corp, 468 Mich 226, 231-232; 661 NW2d 557 (2003) (rejecting application of the discovery rule to extend the statute of limitations in fraud cases); Secura Ins Co v Auto-Owners Ins Co, 461 Mich 382, 387-388; 605 NW2d 308 (2000) (holding that the doctrine of judicial tolling cannot be applied in the absence of statutory language permitting such tolling); Magee v DaimlerChrysler Corp, 472 Mich 108, 113; 693 NW2d 166 (2005) (noting that the “continuing violations” doctrine “renders nugatory the period of limitations established by the Legislature in MCL 600.5805[10]”). While the judicial temptation to relax a statute of limitations may he understandable in the context of a lawsuit in which a plaintiff, alleging that he or she has suffered a serious wrong, has been denied his or her day in court, the costs involved in terms of undermining the clarity and predictability of the law, allowing stale complaints to proceed, and injecting uncertainty into a myriad of legal relationships, are considerable, not to mention that a court that does so would be exercising “legislative,” not “judicial,” power. See Const 1963, art 3, § 2; art 4, § 1; art 6, § 1.

 The first actionable claim in 1992 is five years after plaintiffs 1987 national-origin grievance and plaintiff claims that she was treated poorly up to the date of the 1998 trial, which was eleven years after the grievance was filed.

 In fact, Cathcart testified that he did not remember, and would not have been troubled by, the grievance. Further, plaintiff admitted that, during the period of alleged poor treatment, Cathcart intervened on her behalf when another supervisor sought to change her work hours.

 Cathcart allegedly made another racially derogatory statement regarding Indians in 1989; however, it is outside the limitations period. We also note that Cathcart allegedly made two statements concerning African-Americans. These seem to have little hearing in this case because plaintiff is not African-American. Further, one of these statements occurred at least two years before plaintiffs grievance regarding national-origin discrimination and the other occurred approximately nine years afterward.

 While plaintiff did not indicate when this statement was made, a juror could infer that it was made sometime between 1992 and 1995.

 This conclusion is underscored by the fact that the jury, after learning of all these statements, concluded that plaintiff had not been discriminated against on the basis of national origin.