NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0120n.06

No. 12-1275

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Jan 31, 2013*
DEBORAH S. HUNT, Clerk

HOLLY M. HANDLON,

    Plaintiff-Appellant,

v.

RITE AID SERVICES, LLC, and
TIMOTHY MICHAEL TEVIS,

    Defendants-Appellees.

)
)
)
)
)
)
)

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE EASTERN
DISTRICT OF MICHIGAN

BEFORE: BOGGS, ROGERS, and STRANCH, Circuit Judges.

ROGERS, Circuit Judge. Holly Handlon appeals the district court's opinion and order granting summary judgment to Rite Aid on her claims of false arrest, false imprisonment, defamation, race-based discrimination, retaliation, and intentional infliction of emotional distress. Handlon is a former Rite Aid pharmacy employee who was terminated following an investigation that revealed, according to Rite Aid, that she was stealing hydrocodone pills. In conjunction with its own actions against Handlon, a Rite Aid manager contacted local police and supplied information leading to Handlon's arrest. Handlon brought suit challenging Rite Aid's role in her arrest, which she characterized as deliberately misleading and malicious. She also challenged Rite Aid's motivations for terminating her, which she believes are grounded in racial animus based on her having biracial children, and she claimed retaliation for her complaints about unlawful race

discrimination. Handlon filed suit in the district court based on Michigan's common law, Title VII of the Civil Rights Act of 1964, and Michigan's Elliot–Larsen Civil Rights Act (ELCRA). However, the district court properly granted summary judgment for Rite Aid on all counts.

Handlon began working at Rite Aid pharmacy number 4574 in Port Huron, Michigan in 2008. R.35-2, at 3, PageID #504. Her official title at the time of her termination in October 2009 was Pharmacy Cashier. R.31-3, at 2, PageID #219. This position is one step lower in the pharmacy hierarchy than Pharmacy Technician, although the two jobs share many responsibilities, and cashiers are often in the process of receiving on-the-job training that will qualify them for a promotion to technician. R.3104, at 3–8, PageID #224–229. As a cashier, Handlon's responsibilities included ringing up customers' purchases on the cash register, entering prescriptions into Rite Aid's computer system, printing prescription labels, and dispensing prescriptions. *Id.* Cashiers and technicians both work under the supervision of the store's pharmacists, who are supervised by the store's Pharmacy Manager, James Kaski. Kaski reports to the Pharmacy District Manager, Scott Kroczolowski, who oversees several Rite Aid pharmacy locations in the region.

In August 2009, store employees reported that a staff pharmacist, Joe Carpenter, was behaving oddly. R.31-9, at 2, PageID #285. He was acting strangely during work and coming to the pharmacy during times when he was not scheduled to work. *Id.* This raised concerns with store management that Carpenter may have been taking controlled substances from the pharmacy, so management reached out to Timothy Tevis, who was the District Loss Prevention Manager responsible for the store. R.31-7, at 8, PageID #260. Tevis's job was to protect corporate assets and

investigate suspected theft and fraud at Rite Aid stores in the region.  R.31-7, at 3–6, Page ID #255–258.  Tevis and Kroczolowski decided to conduct surveillance on the pharmacy in store 4574. R.31-7, at 9, PageID #261.  This consisted of the installation and monitoring of three hidden cameras and periodic counts of the store's drug supplies to check for losses.  *See* R.35-13, at 2, PageID #580. On September 4, 2009 Kroczolowski first counted the drugs he thought were most likely to be stolen.  *See* R.31-6, at 10, PageID #244.  A second count performed on September 7 showed no losses.  R.31-12, at 2, PageID #295.  However, the count on September 9, 2009 indicated that the store was missing approximately one 500-count bottle of the painkiller hydrocodone.  R.31-13, at 2, PageID #297.

When Tevis reviewed the videotape from September 8, he observed Handlon acting in a way that suggested she was stealing a bottle of hydrocodone.  R.31-7, at 11, PageID #263.  After refilling a machine that automatically dispenses pills, she took an empty box, along with a full bottle of hydrocodone, to the area where the stock bottles are kept.  R.31-7, at 10, PageID #262.  She set the empty box on the floor and, instead of returning the full bottle to the stock area, she placed the bottle inside the empty box, closed the box, and took the box with her outside of the pharmacy and into the storage and employee locker area.  *Id.*  Tevis documented this behavior and added three more surveillance cameras to film more of Handlon's work areas and the storage area.  R.31-18, at 3, PageID #311.

The drug counts continued to show losses of hydrocodone.  In a Septmber 25, 2009 email, Kroczolowski indicated that over two wholesale bottles—more than 1,000 pills—were missing from

the store.  R.33-1, at 2, Page ID #342.  Upon reviewing the videotape, Kroczolowski and Tevis discovered what they believed to be the cause.  The September 22 video appeared to show Handlon placing two 500-count bottles of hydrocodone in an empty vial box and taking that box and another box out of the pharmacy and into the employee locker area.  R.31-11, at 2–3, PageID #292–3.  Handlon appeared to return one box to a shelf in the storage area, but she kept the second box with her as she carried it past a garbage can and into the locker area, out of camera view.  *Id.*  About thirty seconds later, she returned to camera view and threw the box into the garbage can that she had previously bypassed.  *Id.*  A short time later, Handlon left the store with a rolled up cashier's apron in her hand.  *Id.*  When she returned about one minute later, the apron was unrolled, dangling from her hand.  *Id.*

After viewing the September 22 video, Tevis, Kroczolowski, and Human Resources Manager Paul Yunker decided to call Handlon in to the store to discuss the investigation.  R.31-3, at 3, PageID #220.  The meeting occurred in the Store Manager's office late at night on October 7 and involved Tevis, Handlon, and a female employee named Katherine Taylor, who was asked to observe the interview so that no concerns would exist about the male-female interview.  R.31-7, at 18, PageID #270.  Tevis told Handlon about the videotape evidence and informed her that he would notify the police.  Handlon stood up, said, "then call the police," and walked out of the store.  R.31-18, at 3–4, PageID #311–12.  Handlon agrees that the interview lasted less than two minutes.  R.33-3, at 14, PageID #358.

Tevis then called local police to file a criminal complaint related to the drug theft. R.33-4, at 3–4, PageID #370–71. Officer Rumley of the Port Huron Police Department took a statement from Tevis at the Rite Aid store, and Handlon was arrested forty-five minutes later. R.33-5, at 4–5, PageID #375–76. When Officer Rumley discussed the thefts with Tevis, Rumley was under the impression that Handlon had stolen drugs on that same day, in addition to the occasions that management observed earlier in September. R.35-19, at 5 (dep. pg. 13), PageID #598.

Handlon claims that when she first contacted the store following her arrest, she was told that she had been terminated. R.35-2, at 7, PageID #508. She was later informed that she was suspended pending the investigation for her refusal to comply with the theft investigation. *Id.* On October 20, 2009, Handlon called Tevis and asked to meet with him off-premises, and Tevis informed her that any meeting would have to take place on Rite Aid property. *Id.* Handlon refused, and HR Manager Yunker authorized her termination. R.31-3, at 3, PageID #220.

Handlon, who is Caucasian, has two biracial children. R.35-2, at 5, PageID #506. Her children were with her at times in the Rite Aid store, and at some time around August 2008 a coworker asked Handlon about Handlon's race and the race of her children. *Id.* Handlon complained to Kaski that a pharmacist, Ann Osburn, overheard the other employee's questions to Handlon and subsequently discriminated against her, apparently by yelling at her in front of customers. *Id.* At another time, another employee referred to Handlon as "ghetto." R.35-2, at 6, PageID #507. Around February 2009, Handlon told the store's Retail Manager, Bill Smith, that Osburn cut her hours and yelled at her in front of a customer. *Id.* On June 15, 2009, Handlon wrote

a letter to Kroczolowski complaining that Osburn had been disrespectful and yelled at her in front of customers. R.35-26, at 3, PageID #662. She did not provide any detail linking her race and/or the race of her children to Osburn's actions. *Id.*

After she was terminated, Handlon filed race-discrimination complaints with the Michigan Department of Civil Rights and the U.S. Equal Employment Opportunity Commission ("EEOC"). She subsequently brought suit against Rite Aid and Tevis in the United States District Court for the Eastern District of Michigan, claiming race discrimination under Title VII and ELCRA, retaliation under Title VII and ELCRA, defamation, false arrest/false imprisonment, racial harassment, and intentional infliction of emotional distress. The district court granted summary judgment in favor of Rite Aid on all claims. Handlon appeals the district court's entire summary-judgment order.

### *Race Discrimination*

The district court properly granted summary judgment on Handlon's race-discrimination claim because she did not state a genuine issue of material fact. Her race-discrimination claims under Title VII and ELCRA alleged that Rite Aid terminated her because she is the mother of biracial children. The district court held that she failed to make out a prima facie case because she could not show that she was treated differently from a similarly situated employee. R.37, at 10, PageID #697. Handlon argues that Carpenter was similarly situated, yet was treated more favorably by Rite Aid because, although he was fired, the police were not involved. Appellant's Br. at 22–25.

Handlon does not provide direct evidence of discrimination, and the district court properly analyzed her case under the *McDonnell Douglas* burden-shifting framework that applies to claims

of discrimination based on circumstantial evidence. This framework requires Handlon to show that "'(1) she is a member of a protected group, (2) she was subject to an adverse employment decision, (3) she was qualified for the position, and (4) . . . .' she 'was . . . treated differently than similarly situated non-protected employees.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008) (quoting *Carter v. Univ. of Toledo*, 349 F.3d 269, 273 (6th Cir. 2003), and *Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001)). Handlon argues that Rite Aid's treatment of pharmacist Joe Carpenter, a white employee who was caught on videotape taking small amounts of non-controlled drugs, reveals differing treatment of a similarly situated non-protected employee. Rite Aid terminated Carpenter after he complied with its investigation, but Rite Aid did not report him to the police. R.31-9, at 2, PageID #285.

It is not clear that reporting an employee to the police is an adverse employment action for race-discrimination purposes under Title VII, but we need not address that question because even if Handlon established a prima facie case, she did not succeed in showing that Rite Aid's legitimate non-discriminatory reason for her termination—that she was stealing from her employer—was pretext for unlawful discrimination. An employer's proffered reason for termination can be overturned upon a showing that the employer lacked an honest belief that the employee was guilty of the alleged violations. *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 558–59 (6th Cir. 2009). Although Handlon finds fault with Rite Aid's methods of investigating theft in her store, she produced no evidence to indicate that management did not believe the allegations it levied against her.

Both parties note that the pharmacy's investigation did not initially target Holly Handlon. In fact, the initial reason for the surveillance was Carpenter's suspicious activity. Rite Aid maintains that it decided to take action against Handlon based on the results of the manual pill counts and the contents of the surveillance video. A plaintiff can establish that the employer's proffered reason for determination is pretext for unlawful discrimination by showing that the alleged reason "(1) has no basis in fact; (2) did not actually motivate the adverse employment action; or (3) was insufficient to warrant the adverse action." *Sybrandt*, 560 F.3d at 558. While Handlon contends that the pill counts were inaccurate, she does not dispute that Rite Aid relied upon them. And while she maintains that she did not steal drugs and that the video therefore could not have shown her stealing drugs, she offers no evidence to suggest that Tevis and Kroczolowski did not *honestly believe* the video showed her doing so. Although Handlon has not proven her innocence, even if she had, an "employee cannot establish that the [employer's proffered non-discriminatory] reason was pretextual simply because it is ultimately shown to be incorrect." *Id.* at 558–59. For these reasons, the district court was correct in granting summary judgment to Rite Aid on Handlon's race-discrimination claim.

### *Retaliation*

Summary judgment was also proper with respect to Handlon's retaliation claims under Title VII and ELCRA. As the district court properly concluded, her Title VII claim fails because she did not exhaust administrative remedies. Handlon did not mention retaliation in her EEOC charge, nor did she ever amend the charge to include this claim. Therefore, only her ELCRA claims are properly before this court. Even if Handlon engaged in activities protected by ELCRA, she did not show a

causal connection between her activities and her termination or the involvement of the police. For

that reason, the district court properly resolved this claim in Rite Aid's favor on summary judgment.

Establishing a prima facie case of retaliation requires a showing that the plaintiff engaged in

a protected activity. *Garg v. Macomb Cnty. Cmty. Mental Health Servs.*, 696 N.W.2d 646, 653

(Mich. 2005). Handlon alleges that she was retaliated against in response to the following three

activities: (1) she complained to Kaski because a coworker asked about her race and the race of her

children and because Ann Osburn later yelled at her in front of customers; (2) she complained to the

store manager, Bill Smith, about her hours being cut; and (3) she wrote a letter to Kroczolowski

claiming "discriminative" treatment and stating that Osburn had disrespected her and yelled at her

in front of customers. It is not clear that, based on these activities, Handlon took the type of stand

against discrimination that warranted protection under ELCRA. We need not resolve the question,

however, because in any event Handlon failed to establish a causal connection between her

complaints to management and her termination. A causal connection is an essential element of a

prima facie case of retaliation under ELCRA. *Garg*, 696 N.W.2d at 653. Handlon attempts to pin

the causal connection entirely on temporal proximity; however, the Michigan Supreme Court in

interpreting ELCRA has stated unequivocally that "in order to show causation in a retaliatory

discrimination case, '[p]laintiff must show something more than merely a coincidence in time

between protected activity and adverse employment action." *Id.* at 660 (quoting *West v. Gen. Motors

Corp.*, 665 N.W.2d 468 (Mich. 2003)). Handlon cites this circuit's decision in *DiCarlo v. Potter*,

358 F.3d 408 (6th Cir. 2004), for "the premise that in certain distinct cases where the temporal

proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *See id.* at 421. This argument fails because *DiCarlo* provides an interpretation of Title VII and not ELCRA, and this court must defer to Michigan's interpretation of the latter.

### *Defamation*

The district court also properly granted summary judgment on Handlon's defamation claim regarding Tevis's statements to Officer Rumley. Citizens' statements to law enforcement are protected by at least a qualified privilege. Such a privilege can be defeated only by a showing of actual malice. Because Handlon has not presented evidence suggesting that Tevis acted with actual malice, his statements to Officer Rumley cannot form the basis of a defamation claim.

A defamation claim must have the following elements:

> (1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged communication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of a special harm caused by publication.

*Mitan v. Campbell*, 706 N.W.2d 420, 421 (Mich. 2005). Handlon's claim, however, does not concern an unprivileged communication, but rather a statement made to police. There is some support in Michigan law, including practice manuals, that statements to police are absolutely privileged. *E.g.*, *Flynn v. Boglarsky*, 129 N.W. 674, 676 (Mich. 1911); *Shinglemeyer v. Wright*, 82 N.W. 887, 890–91 (Mich. 1900); *Farokhrany v. Jackson*, No. 291616, 2010 WL 2977134, at *2 (Mich. Ct. App. July 29, 2010); 15 Mich. Civ. Jur. Libel and Slander § 47, Complaints and information directed to police (2012). However, other authority supports the conclusion that such

statements may only be protected by a qualified privilege. *E.g.*, *Hall v. Pizza Hut of Am., Inc.*, 396

N.W.2d 809, 813–14 (Mich. 1986)[1]; *Sanders v. Stanley*, 794 F. Supp. 2d 755, 762 (E.D. Mich.

2011). To overcome such a qualified privilege, a plaintiff must produce evidence that the

complained-of statements were "intentionally false or made with reckless disregard for the truth,"

a standard known as "actual malice." *Sanders*, 794 F. Supp. 2d at 762. Assuming that a qualified

privilege applies, Handlon failed to meet this burden.

There is little question that Tevis believed, based on the video surveillance and pill counts,

that Handlon had stolen drugs from the pharmacy prior to her arrest and therefore that the allegations

of a pattern of drug theft made to Officer Rumley, without regard to whether they were in fact true,

were made in good faith. These accusations plainly cannot support a defamation claim, because in

relying on the evidence available to him, Tevis plainly evaluated the truth or falsity of his statements.

Although Handlon presents a spirited argument that Tevis's statement to Officer Rumley regarding

theft on the date of Handlon's arrest contained false information, she set forth no evidence that Tevis

made that statement with actual malice. Therefore, her defamation claim fails because Tevis's

statements are protected by the qualified privilege.

---

[1]*Hall* is sometimes cited for the proposition that "information given to police officers regarding criminal activity is absolutely privileged." *Hall*, 396 N.W.2d at 813. However, after making this statement, the court immediately appeared to retreat, stating in the next sentence that "[e]ven if [the defendant's] statements were not absolutely privileged, a qualified privilege extends to all communication made bona fide on any subject matter in which the party communicating has an interest [and in certain other enumerated situations]." *Id.* The court proceeded to discuss the defamation claim in terms of qualified privilege, "[h]aving decided that at least a qualified privilege protected [the] statements." *Id.* at 814.

*False Arrest/False Imprisonment*

Summary judgment was also proper on Handlon's false arrest claim that Tevis gave false information to the police in his report to Officer Rumley. Tevis can only be held liable for Handlon's arrest if Officer Rumley acted at Tevis's direction and not through an exercise of Rumley's own judgment, *see Lewis v. Farmer Jack Div., Inc.*, 327 N.W.2d 893, 894–95 (Mich. 1982), and Handlon provided no evidence that Officer Rumley acted at Tevis's direction.

In *Lewis*, the Michigan Supreme Court focused on the degree of direction a private citizen exercises over an official arrest: "It is not enough for instigation that the actor has given information to the police about the commission of a crime, or has accused the other of committing it, so long as he leaves to the police the decision as to what shall be done about any arrest, without persuading or influencing them." *Lewis*, 327 N.W.2d at 895 n.3 (quoting Restatement (Second) of Torts, §45A cmt. c). The court held that, where a store employee contacted police to report that she identified the man responsible for a previous robbery and the man was arrested based on the information the employee provided, "[t]he police acted on and in the exercise of their own judgment and not at the direction of [the employee] or the manager." *Id.* at 895. The court further noted that the employee "communicated facts and circumstances to the officer, her perception that Lewis was the robber. The officer was left to act on his own judgment and evidently acted on his own judgment in arresting Lewis." *Id.* at 895 n.3. In contrast, the Michigan Supreme Court held in *Maliniemi v. Gronlund*, 52 N.W. 627, 627–28 (Mich. 1892), that an officer acted upon the judgment of a private citizen where

the citizen directed the officer to an individual matching the description of a suspect and the plaintiff was arrested immediately without verifying his identity in any way.

Under the "judgment and direction" analysis suggested by *Gronlund* and *Lewis*, plaintiff's evidence does not support a genuine issue of fact for the jury. Tevis called the police to make a complaint, and Officer Rumley arrived and took his complaint, in which he alleged "facts and circumstances" and his "perception" that Handlon was responsible for the missing pills. *See Lewis*, 327 N.W.2d at 895 n.3. The officer received the information from Tevis, and, based on that information, concluded that Tevis's description supported a charge of embezzlement. Forty-five minutes later, the officer located and arrested Handlon. Handlon points to no evidence in the record that Tevis commanded the officer to arrest Handlon, or that she was arrested simply at Tevis's request, rather than upon a weighing of his statements. These facts are similar to the facts in *Lewis* and support the same result.

### *Intentional Infliction of Emotional Distress*

Finally, Handlon's claim of intentional infliction of emotional distress (IIED) is without merit. Under Michigan law, a successful IIED claim must involve (1) extreme or outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Webster v. United Auto Workers, Local 51*, 394 F.3d 436, 442 (6th Cir. 2005). Handlon's claim founders out of the gate. "The threshold for showing extreme and outrageous conduct is high," and Handlon clearly fails to meet it. *See VanVorous v. Burmeister*, 687 N.W.2d 132, 142 (Mich. Ct. App. 2004). For conduct to meet the standards for an IIED claim, it must be "so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 908–09 (Mich. 2004). No interpretation of Rite Aid's activity—which includes processing employee complaints of friction in the workplace, performing a theft investigation, reporting suspected theft to the police, suspending an employee, and terminating an employee—can be presented as fitting this description.

The judgment of the district court is affirmed.