**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0664n.06**
**Filed: September 5, 2006**

**No. 05-2151**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DEBORAH SCOTT, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| TOTAL RENAL CARE, INC., a foreign | ) | EASTERN DISTRICT OF MICHIGAN |
| corporation, | ) | |
| | ) | |
| | ) | |
| DAVITA, INC., a foreign corporation, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |
| | ) | |

**Before: GIBBONS, ROGERS, Circuit Judges; HOLSCHUH, District Judge.**[*]

**ROGERS, Circuit Judge.** This is a diversity action for retaliatory discharge in violation of Michigan public policy and statutory law. The plaintiff, Deborah Scott, seeks reversal of the district court's grant of summary judgment to the defendants, DaVita, Inc., Scott's former employer, and Total Renal Care, Inc., DaVita's corporate predecessor. The district court's judgment is affirmed.

_____

[*]The Honorable John D. Holschuh, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

**I.**

On March 26, 1996, Scott began working for DaVita as a social worker. DaVita is a private, for-profit dialysis clinic located in North Oakland, Michigan. Scott was terminated on February 5, 2004, allegedly in retaliation for internal complaints to DaVita management related to DaVita's inadequate staffing and racially discriminatory hiring practices.

Scott addressed a letter to Regional Director Martin Konal, dated July 8, 2003, complaining about various happenings at DaVita. Scott also enclosed a four-page letter written by co-worker Marietta Kroll. Scott "signed and verified for accuracy" the letter by Kroll. Scott also "verif[ied] points covered" in a recent meeting with Konal, Janet Matsura (Scott's then-supervisor), and Kroll.

In her letter to Konal, Scott complained about so-called "critical issue[s]," such as a lack of "enough staff," the hiring of inexperienced staff, management's coercion of some employees to quit their jobs, and unspecified violations of the employee handbook and DaVita's "values." These same sorts of allegations also appeared in Kroll's letter, which was attached to Scott's letter. While discussing this letter in her deposition, Scott emphasized DaVita's inadequate staffing.

In November of 2003, Scott made an anonymous complaint about DaVita's staffing and some other practices to Michigan authorities, but the authorities did not pursue Scott's complaint.

In December of 2003, Scott spoke to Konal and expressed concern that Facility Administrator Geraldo Todd, who at the time was Scott's immediate supervisor, "was terminating the white

employees and hiring all blacks, and that he was favoring the black race in general." Konal told Scott that he would review her complaint. Konal admitted in his deposition that Todd had in fact been "replacing whites with blacks," but Konal was not troubled by this because "the team was predominantly Caucasian while the patients are 70 percent African American. I thought that it was a positive thing for the unit to have a better—a more diverse team."

Scott also brought up Todd's alleged racial discrimination in a meeting in January of 2004 with People Services Manager Mary Nixon. Todd in his deposition denied any knowledge of Scott's racial discrimination complaints.

In a letter dated January 28, 2004, addressed to Bob Schlichenmaier of Renal Network 11, Scott accused colleague and Unit Secretary Kristin Clark of failing to provide important paperwork in a timely manner. Renal Network is an organization that gathers information on renal clinics in Michigan. It is a private, cooperative association of clinics and is not a part of DaVita. Scott provided a copy of her Renal Network letter to Todd and others at DaVita.

Scott's letter to Schlichenmaier stated that Clark missed a January 12, 2004, deadline to complete required data forms. Further, Clark requested an extended deadline of January 16, but she missed that deadline too. A letter, dated January 28, stated that "we will need another extension for" Clark to do her work. The letter also stated that Scott and others were not at fault for the delay but that Clark had failed to retrieve the needed information for the forms.

In early February 2004, Todd saw the letter that Scott addressed to Renal Network 11 for the

first time. He faxed a copy of it to Konal along with a message that it contained untruthful statements. Konal said in his deposition that he considered Scott's letter "unprofessional" and that he thought Scott's letter misrepresented the company. Konal and Todd discussed the letter. Todd made known to Konal his plan to "give [Scott] a written warning for that conduct," referring to the letter.

On January 29, 2004, Scott and some of her co-workers met with People Services Manager Mary Nixon. The meeting's attendees included Nixon, Scott, Kroll, and Linda Aiken. The employees complained that staffing was insufficient. Scott also complained that Todd was not approachable, that management had treated some employees with "favoritism," and that Clark could not be depended on "to do anything." As noted above, at this meeting Scott also brought up Todd's alleged racial discrimination.

On February 5, 2004, Todd requested a meeting with Scott. According to Todd's documentation of the meeting, he met with Scott to "discuss a letter [she] had written on January 28, 2004" to Renal Network 11 as well as some memoranda written by Scott. Todd brought a witness with him, Marcia Schweisthal, the Clinic Coordinator. Todd noted in his documentation for the meeting that "[e]fforts to focus on the DaVita values violations such as Integrity, Team, Accountability, as well as Service Excellence proved unsuccessful." According to Todd,

> The session quickly digressed to a point where the DaVita teammate mentioned in
> the letter, Krist[i]n Clark, Unit Secretary, was asked to join the discussion to clear up
> inconsistent comments made by [Scott]. At this point [Scott] repeated her statement
> that Krist[i]n informed her that all the requested documents for the Renal Network

were completed. Krist[i]n emphasized that she made no such statement to [Scott] as well as asked why with a team of three full time clerical teammates and one part time clerical teammate she was singled out by full name in [Scott's] letter to the Renal Network. Regarding the completed documents, [Scott] stated to Krist[i]n, "You are a liar!" . . . [Scott] abruptly stated she felt that all three teammates had planned this meeting in advance and was "out to get her". [Scott] stated she would sue me if her opinion proved correct.

[Scott] then walked out of the meeting and stated she was leaving the facility for the day. I asked [Scott] not to leave the facility and to resume the meeting to bring some closure. I also informed [Scott] that if she immediately left the facility for the day, I would view this as job abandonment on her part. [Scott] stated emphatically she was having no part of the meeting and was leaving. At this point I again informed [Scott] that if she left the facility I would view this as job abandonment and that I would be forced to take appropriate actions. [Scott] then for the first time abruptly stated that she was sick with cold-like symptoms and was leaving immediately. Up to this point [Scott] not only appeared physically healthy but also had not previously shared a desire to leave the facility due to illness. I stated to [Scott] that I was requesting that she remain at North Oakland Dialysis for at least one hour to conclude the meeting tasks. For a third time, I informed [Scott] that if she left immediately I would view this as job abandonment. [Scott] continued to gather her coat and personal items and left the facility. . . .

I immediately contacted [and consulted] my Regional Director, Marty Konal, and my People Services Manager, Mary Nixon. . . . Following a promptly arranged conference call with our DaVita Legal Counselor, Steve Cooper, the decision was made to immediately terminate Deborah Scott due to job abandonment. A letter informing [Scott] of this decision was written by me and reviewed by Marty and Mary.

According to the sworn declaration of Schweisthal, she witnessed the February 5 meeting. It was "Mr. Todd's practice" to bring a witness "when he met with individual employees to discuss performance improvement or disciplinary issues." Schweisthal stated that during the meeting Todd attempted to discuss with Scott "a letter she had sent to Renal Network 11 on DaVita stationery

blaming . . . Unit Secretary Kris Clark for the facility's failure to provide certain information to the Network in a timely manner." Todd also attempted to bring up a memo by Scott on the same subject. Todd "tried to explain" to Scott that "she should have spoken to him first [about these matters], that she had violated the proper chain of command, and that her actions had been unacceptably disrespectful to a co-worker."

According to Schweisthal, "Clark knocked on the door with a question for Mr. Todd, and Mr. Todd asked her to join the meeting. Unfortunately, the meeting then became even more acrimonious." Schweisthal stated that "Scott accused Ms. Clark of lying," and Todd admonished her for making an offensive comment to a co-worker. In Schweisthal's telling "Scott then said, 'That's it, I'm done.' Mr. Todd responded that 'we aren't finished.'" Scott began to leave and "said that she was going to file a grievance and a lawsuit," according to Schweisthal. Scott then said "I'm ill, I'm going home." According to Schweisthal:

> Mr. Todd clearly told Ms. Scott that if she left before he was finished with what he had to say to her, he would consider her to have abandoned her job. Ms. Scott left the facility anyway. Mr. Todd repeated this two more times as he followed her down the hallway to her office. I followed them down the hallway. She closed the door in his face. She came out approximately ten minutes later and left the building.

Just before leaving, according to Schweisthal's contemporaneous, handwritten account of the incident, Scott "told a teammate she was leaving for lunch."

According to the declaration of Clark, she was present at the February 5 meeting involving Todd, Scott, and Schweisthal. Clark stated that the "meeting was, in part, about a letter Ms. Scott

had written to Renal Network 11 about missing documentation for which she blamed me. . . . [Scott] called me a liar." According to Clark, Scott denied calling Clark a liar, but was contradicted by Todd, Schweisthal, and Clark, who each "said Yes you did," according to Clark's contemporaneous, handwritten account of the event. Scott then announced, "That's it, I'm done." Before Scott left "Scott announced that she was going to lunch."

Scott's account of the February 5 meeting disagrees with the accounts of Todd, Schweisthal, and Clark in several of its details. Scott stated that Todd called her into a meeting to discuss delegating back to the secretaries some of the workload that had shifted to others. According to Scott, she was "getting ready to leave for the day" because she was ill. Scott "said I was going to be leaving early, and basically I was getting ready to leave," but Todd "came in and said, well, I'd like you just to take a minute, you know, would you grab your coffee or whatever, it won't take long, I want to talk to you." Scott in her deposition related that Schweisthal was already in the meeting room when Scott and Todd arrived, and that Clark arrived before the meeting began.

In Scott's recollection, the meeting was "short-lived." Todd became "abusive" and the others shot "glances towards each other, kind of smiling and snickering" in a manner that Scott disliked. Todd told Scott that she "wasn't a team player." Scott in her deposition attributed her lack of "team player" status in Todd's eyes not to her complaints in the Renal Network letter but to her "resisting, you know, taking on all of these responsibilities, and you know, for clerical tasks and the fact that I was trying to move forward to allow the secretaries to take these secretarial responsibilities back, that that somehow I was not a team player . . . ."

Scott responded by saying, "you know, Geraldo, I'm sorry, you know I'm sick, I'm leaving and that's it, you know." She also said, "I'm sick, I'm going home, I have the right to go home, and I am not going to be—I'm not going to sit here and be abused by you and I got up and left." According to Scott, Todd followed her while screaming. Scott told Todd that she would "take a brief lunch hour and I will come back, you know, but I have to go to the doctor." Scott said in her deposition that she did not remember whether Todd told her that she would be fired for "job abandonment" if she left without permission. Later in her deposition, Scott agreed with opposing counsel's question that Todd told her "that if you left, he would consider it an act of termination," with the following response, "Yeah, but I didn't leave." When asked by opposing counsel whether she left, she said, "No. I just left for my lunch hour, which is what he told me to do, and come back, which is what I did."

According to Scott, she left the clinic and went to Coney Island and then came back to the clinic about twenty minutes later. She claims that she wrote Todd a note telling him how to reach her and informing Todd that she "was going to my doctor's and that's what I did." Scott said in her deposition that she missed work for the remainder of February 5 and the full day on February 6, calling in sick, but had no idea that she had been terminated on February 5. "I just continued to call in sick," she said. DaVita co-workers informed Scott via telephone that her termination had been announced and that the company website listed her position as vacant. Scott remarked in her deposition that her memory of the events surrounding the February 5 meeting is "kind of muddled."

In a letter dated February 5, 2004 and sent to Scott's address, Todd terminated Scott's

employment with the clinic. The letter reads: "This letter serves as official notification of your termination from DaVita North Oakland Dialysis facility effective immediately. The reasons cited for your termination are the result of unprofessional conduct resulting in job abandonment on your behalf."

Todd, in his deposition, testified, "Once I made the decision to terminate Deborah Scott, I conferred with our People Service Manager, my manager, the legal department in DaVita just for clarification. . . ." In his deposition, Konal explained that he, Todd, Nixon, and Cooper discussed the proper response to Scott's decision to walk off the job. Everyone agreed that Scott could be fired for her conduct, and Nixon recommended that she be terminated. According to Konal, Todd made the ultimate decision to terminate Scott.

Company records show that Konal, Nixon, and DaVita Vice President Greg Hartman administratively approved Scott's termination for payroll purposes. Todd created a termination report explaining Scott's termination as follows: "[a]bandoned job, walked out during performance management plan discussion." Konal stated in his deposition that "job abandonment" means "[l]eaving the facility without permission." Konal also implied that the clinic has never fired any employee other than Scott for "job abandonment." Nixon said in her deposition that the clinic has no policy pertaining to "job abandonment."

Scott filed this suit following her termination. Her complaint set forth three counts, each alleging retaliatory discharge. Scott claimed in the complaint that by retaliating against her,

defendants violated (1) Michigan's Whistleblowers' Protection Act, Mich. Comp. Laws § 15.361 *et seq.*; (2) Michigan public policy; and (3) Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.*

The district court granted summary judgment in favor of defendants and dismissed the case. Regarding Scott's whistleblower claim, the district court observed that the Whistleblowers' Protection Act (WPA) forbids employers from retaliating against employees for reporting violations of law to a public body. Scott alleged that DaVita fired her in retaliation for reporting DaVita's inadequate staffing, among other problems, to State authorities. The district court held that Scott's whistleblower claim should be rejected because she had failed to produce evidence tending to prove a causal connection between her termination and her complaints to the State. Scott had merely shown that she was terminated after her complaints, not because of them, which is insufficient to raise a genuine dispute over causation.

The district court held that Scott's public policy-based claim could not proceed because the WPA is the exclusive cause of action governing employer retaliation against employees for their reports of legal violations to public bodies. Reasoning that Scott's exclusive cause of action lies with the WPA, the district court held that she may not bring a public policy-based action grounded in the Michigan Public Health Code.

Regarding Scott's ELCRA claim, the district court held that Scott "cannot establish a *prima facie* case of retaliation under" ELCRA "and thus her retaliation claims must be dismissed." In

particular, Scott had failed to establish a causal connection between Scott's complaints of racial discrimination and her termination. Scott's whole argument for such causation, the district court observed, "relied solely on the proximity in time between her November 2003, December 2003, and January 2004 complaints about possible racial discrimination and her February 5, 2004 discharge." Reasoning that time-order, without more, is insufficient to create a genuine dispute over causation, the district court dismissed the case.

This appeal followed. Scott does not appeal the dismissal of her WPA claim. Scott challenges only the dismissal of the public policy and ELCRA claims. With respect to the public policy claim, in this appeal Scott challenges its dismissal only to the extent that the claim is based on her internal complaints to her DaVita superiors.

## II.

"This court reviews the grant of summary judgment de novo." *Reeves v. Swift Transp. Co., Inc.*, 446 F.3d 637, 640 (6th Cir. 2006). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A.

The district court properly dismissed Scott's claim for retaliatory discharge in violation of

Michigan public policy because no law or policy tells Michigan employers that they must not retaliate against employees who report legal violations to their supervisors.

This court's unpublished opinion in *Cushman-Lagerstrom v. Citizens Insurance Co. of America*, 72 Fed. Appx. 322 (6th Cir. 2003), is on point in all respects and is persuasive. In *Cushman-Lagerstrom*, this court rejected the plaintiff's argument—advanced here by Scott—that it is generally contrary to Michigan public policy to fire an employee for reporting violations of the law to superiors. *Compare id.* at 328, *with* Appellant's Br. at 24-26.

The *Cushman-Lagerstrom* court assumed that the plaintiff had reported actual or impending Michigan Insurance Code violations but nevertheless was "not persuaded that Michigan has provided a 'public policy' cause of action for an employee who is discharged for reporting violations of law to a superior." *Id.* The court supplied two reasons for this conclusion, both of which apply to Scott's analogous claim.

First, the *Cushman-Lagerstrom* court noted that the reporting of Michigan Insurance Code violations to one's superiors at work was not listed among the recognized grounds for public policy retaliatory discharge claims. *Id.* at 328-29. Claims of retaliatory discharge based on Michigan public policy may rely on the following three grounds only:

> (1) the employee is discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty, (2) the employee is discharged for the failure or refusal to violate the law in the course of employment, [or] (3) the employee is discharged for exercising a right conferred by a well-established legislative enactment.

*Id.* at 328 (quoting *Edelberg v. Leco Corp.*, 599 N.W.2d 785, 786-87 (Mich. Ct. App. 1999)). The *Cushman-Lagerstrom* court noted that the factual situation presented in that case simply did not match any of these three public policy grounds for a claim. *Id.* That is true here as well. The federal regulations cited by Scott in her brief govern dialysis clinics' staffing and sanitation levels; they do not explicitly create a duty or right of employees to report violations to their superiors. *See* 42 C.F.R. § 405.2162(b)(3) and § 405.2163(d). Just as the *Cushman-Lagerstrom* plaintiff's reports of Insurance Code violations did not match the public policy grounds for a retaliatory discharge claim, neither do Scott's reports match them. Michigan public policy does not protect Scott's right to make such complaints to her employer.

Second, *Cushman-Lagerstrom* noted that no "controlling or persuasive Michigan case law" had "extended the public policy exception [to at-will employment] to discharges in retaliation for reporting violations of law to superiors" in general. 72 Fed. Appx. at 328-29. That remains true today and requires affirmance of the district court's judgment.

In drawing this conclusion, the *Cushman-Lagerstrom* court held inapplicable the two cases on which Scott principally relies. Those two cases are *Watassek v. Michigan Department of Mental Health*, 372 N.W.2d 617 (Mich. Ct. App. 1985), and *Meury v. Connie Kalitta Services/American International Airways, Inc.*, No. 97-1877, 1999 U.S. App. LEXIS 21188 (6th Cir. May 20, 1999). Appellant's Br. at 24 (citing *Watassek* and *Meury*). *Cushman-Lagerstrom* demonstrated that neither *Watassek* nor *Meury* is persuasive.

*Watassek* held that Michigan common law prior to the WPA's passage created a public policy cause of action for retaliatory discharge where an employer fires an employee for reporting legal violations to supervisors. *See* 372 N.W.2d at 621. *Meury* cursorily adopted the position of *Watassek* in this regard as an alternative ground for its decision that an employee who had been fired for reporting violations of federal aviation regulations had a public policy-based cause of action for retaliatory discharge under Michigan law. 1999 U.S. App. LEXIS 21188, at *4-*5.

*Cushman-Lagerstrom* demonstrated that *Watassek* is unpersuasive and had been essentially rejected in all relevant respects in subsequent Michigan court cases.

> The *Watassek* court reasoned that the 1981 passage of the Whistleblowers' Protection Act ("WPA") after the plaintiff's 1976 termination meant that there must have existed prior thereto a common law counterpart to the WPA: consequently, it held that a public policy claim for discharge in retaliation for reporting violations to a superior (i.e., a common law counterpart to the WPA) was available in 1976. *Id.* at 620. The court was silent as to whether such a common law claim survived the WPA's passage, which essentially limited the reach of its holding to discharges occurring before the WPA's passage in 1981. Plaintiff's discharge, on the other hand, occurred in 2000, well after the passage of the WPA. Therefore, *Watassek* is not controlling. . . .

> We find more persuasive *Covell v. Spengler*, 141 Mich. App. 76, 366 N.W.2d 76, 79-80 (Mich. Ct. App. 1985) (holding that no common-law cause of action for a discharge in retaliation for reporting violations existed before passage of the WPA, which thereafter became the exclusive remedy for an employee whose employment is terminated in retaliation for reporting an employer's violation of the law), as well as *Shuttleworth v. Riverside Osteopathic Hosp.*, 191 Mich. App. 25, 477 N.W.2d 453, 454-55 (Mich. Ct. App. 1991) (declining to find a common law counterpart to the WPA). Indeed, *Shuttleworth* specifically criticized the *Watassek* court's approach, which it viewed as "nothing more than an attempt to give preenactment effect to a statutory right by fabricating a supposed preexisting common-law right wholly from the provisions of the subsequently enacted statute." *Id.* at 455. We

- 14 -

> therefore hold that Michigan does not recognize a common law cause of action for an employee who has been discharged for reporting violations of law to a superior.

72 Fed. Appx. at 329-30 (footnote omitted). *Cushman-Lagerstrom* further held that *Meury*'s cursory alternative holding was also unpersuasive insofar as it adopted the view of *Watassek*. *Id.* at 329. *Cushman-Lagerstrom* thus held that "Michigan does not recognize a common law cause of action for an employee who has been discharged for reporting violations of law to a superior" in general. *Id.* at 330.

Scott's public policy claim cannot be distinguished from *Cushman-Lagerstrom.* Scott, like the plaintiff there, cites the unpersuasive cases of *Watassek* and *Meury*, and no others, to support her assertion that her cause of action is cognizable. Appellant's Br. at 24. Just as the *Cushman-Lagerstrom* plaintiff had brought no cognizable public policy claim for retaliatory discharge, neither has Scott done so.

Therefore, the district court did not err when it dismissed Scott's Michigan public policy claim based on her internal complaints.

**B.**

Scott's ELCRA claim presents no genuinely disputed issue of material fact because Scott has not supplied sufficient Rule 56 evidence to demonstrate a causal connection between her racial discrimination complaints and her termination, as is required to establish a prima facie case under ELCRA. *See Barrett v. Kirtland Cmty. Coll.*, 628 N.W.2d 63, 70 (Mich. Ct. App. 2001).

The elements of a prima facie case under ELCRA are as follows:

(1) that the plaintiff engaged in a protected activity, (2) that this was known by the defendant, (3) that the defendant took an employment action adverse to the plaintiff, and (4) that there was a causal connection between the protected activity and the adverse employment action.

*Id.* Arguably, the first and second elements are met, respectively, because Scott complained about alleged illegal racial discrimination, and because Konal and Nixon (both of whom approved Todd's termination of Scott) knew about Scott's complaints. The third element is met because Scott's termination qualifies as an adverse employment action.

Even assuming, however, that the first, second, and third prima facie elements are met, Scott has not sufficiently established the fourth element, i.e., a causal connection between her termination and her discrimination complaints. The Michigan Supreme Court's recent opinion in *Garg v. Macomb County Community Mental Health Services* is analogous to this case and supports the conclusion that Scott has not adequately established the required causal connection between her termination and her racial discrimination complaints. *See* 696 N.W.2d 646, 660-61 (Mich. 2005).

In *Garg*, the Michigan Supreme Court held that the employee plaintiff had supplied insufficient evidence to establish a causal connection between her supervisor's denial of a promotion request and her filing of an internal grievance. *Id.* The *Garg* plaintiff had filed a grievance complaining that she had suffered discrimination in employment on the basis of her national origin. *Id.* at 655. The *Garg* plaintiff's supervisor, Kent Cathcart, received the grievance, which was denied

without investigation. *Id.* at 651. Cathcart subsequently denied one of the *Garg* plaintiff's requests for promotion. *Id.* at 651. The plaintiff filed other promotion requests involving four other supervisors. *Id.* at 651, 660. These other promotion requests were denied as well. *Id.* These other four supervisors "had no knowledge of plaintiff's grievance." *Id.*

The Michigan Supreme Court held on these facts that "a juror could not reasonably conclude that the reasons behind the denials within [the place of employment] were related to the grievance," because no evidence "suggest[ed] any distinction between the promotion denial that occurred while plaintiff was in Cathcart's chain of command and those denials involving supervisors who had no knowledge of plaintiff's grievance." *Id.* at 660. The supervisors who lacked knowledge of the *Garg* plaintiff's grievance consequently "could not have 'retaliated' against plaintiff for its filing." *Id.* Moreover, the *Garg* plaintiff's qualifications had not "changed in any meaningful way in the time between the [promotion] denial by Cathcart and the denials by the other supervisors." *Id.*

Since the *Garg* plaintiff had been treated the same by all supervisors, and her qualifications had not materially changed, the plaintiff had only one basis for asserting that Cathcart had retaliated against her for filing a grievance: time-order, i.e., the grievance preceded Cathcart's promotion denial. *See id.* at 660-61. But time-order is insufficient as a matter of law to establish a causal connection between an adverse employment action and protected activity. *Id.* Therefore, no juror could reasonably find that Cathcart's promotion denials were causally related to the grievance. *Id.* at 660.

*Garg* controls the causation issue in this case.  Here, Scott's termination involved three supervisors (Konal, Nixon, and Todd) and one company lawyer (Cooper), all of whom agreed that Scott could be fired for job abandonment but only two of whom knew about Scott's racial discrimination complaints.  Konal and Nixon alone knew about Scott's complaints.  Similarly, in *Garg* five supervisors denied the plaintiff's requests for promotion but only one, Cathcart, knew about the plaintiff's grievance.  Just as no evidence in *Garg* suggested any distinction between the promotion denials by Cathcart and the four other supervisors, here no evidence suggests such a distinction between Konal's and Nixon's position favoring termination and Todd's and Cooper's identical inclination.  Just as the *Garg* supervisors all treated the plaintiff the same way regardless of whether they knew about her grievance, here Konal, Nixon, Todd, and Cooper all agreed that Scott could be fired for job abandonment regardless of whether they knew about her racial discrimination complaints.  In *Garg*, no juror could reasonably find that Cathcart's denial of promotion had anything to do with the grievance.  Likewise, in this case Todd's and Cooper's agreement that Scott could be fired, despite not knowing about her complaints, prevents any reasonable inference of a causal connection between Scott's termination and her complaints.

One might argue that *Garg* is distinguishable from this case by pointing out that in *Garg* successive supervisors denied promotions apparently without Cathcart's input, while in this case Scott's superiors consulted each other.  Konal and Nixon, the argument could be made, might have retaliated against Scott for her complaints by convincing Todd and Cooper to fire Scott.  But such an argument would be unpersuasive for two reasons.  First, Scott has not argued in her brief that

Konal or Nixon compromised Todd's or Cooper's independent judgment. Nor has Scott produced any Rule 56 evidence that would support such an argument, such as elicited deposition testimony from Todd or Cooper that he was ambivalent about firing Scott before coming under pressure from Konal or Nixon.

Second, Todd's preliminary decision to fire Scott must have been made independent of any influence from Konal or Nixon because Todd warned Scott that she could be terminated *before* he consulted Konal and Nixon. The record indicates, therefore, that Todd arrived at his initial decision to terminate Scott just as independently as the four *Garg* supervisors who denied the plaintiff's promotion requests arrived at their decisions. And the undisputed testimony of Konal stated that Todd also made the ultimate decision to terminate Scott. On this record, *Garg* cannot be distinguished from this case on the basis that Konal or Nixon unduly influenced Todd or Cooper. *Garg* thus supports the conclusion that Scott has not produced sufficient Rule 56 evidence of causation to survive summary judgment. Scott has not established a prima facie case for retaliation under ELCRA.

**III.**

For the foregoing reasons, the district court's judgment is affirmed.