*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v

DEONTON AUTEZ ROGERS,

Defendant-Appellee.

FOR PUBLICATION
August 5, 2021
9:00 a.m.

No. 346348
Wayne Circuit Court
LC No. 18-006351-01-FH

ON REMAND

Before: GADOLA, P.J., and SERVITTO and REDFORD, JJ.

GADOLA, P.J.

This case returns to this Court on remand from our Supreme Court for reconsideration in light of *Bostock v Clayton Co, Georgia*, __ US __; 140 S Ct 1731; 207 L Ed 2d 218 (2020) of the prosecution's challenge to the trial court's order dismissing the charge against defendant of ethnic intimidation, MCL 750.147b. We reverse the trial court's order granting defendant's motion to quash the ethnic-intimidation charge, reinstate the ethnic-intimidation charge, and remand for further proceedings.

## I. FACTS

The basic facts of this case were set forth in this Court's prior opinion as follows:

This case arises out of an altercation between defendant and the complainant on the night of July 23, 2018. The complainant is a transgender person, which she explained to the court means that she was assigned as a male at birth but now identifies as a woman, living her life and presenting herself as such in society. On the night of the incident, the complainant went to a gas station in Detroit to make a purchase. When she arrived at the gas station, she saw defendant inside the gas station with a woman. The complainant got in line, and defendant began talking to her, using derogatory terms. According to the complainant, defendant made various offensive statements to her, including, "[Y]ou're a nigga." The complainant

-1-

responded that "nigga is somebody that identify [sic] themselves as a man, carry themselves as a man. I don't do that. I'm a transgender." Defendant then asked the complainant about her sex organs and asked if he could see "it." The complainant tried to ignore defendant, but he continued to make derogatory remarks, which the complainant described as "gay" in nature and included calling her a man and asking to see her penis. Defendant then pulled out a gun and threatened to kill her. The complainant was frightened that defendant would follow through on his threat to kill her. The woman with defendant told defendant to leave the complainant alone and to leave the gas station. While defendant was speaking to the complainant, a child who had arrived in the car with defendant entered the gas station. Defendant subsequently walked in close proximity to the complainant, gun in hand, moving toward the exit. The complainant testified that she feared that defendant would turn around and shoot her before leaving the gas station. The complainant further testified that transgender people are often attacked and harmed and that she feared for her life. Reacting to the threat from defendant, she grabbed at defendant's hand as he came near her in an attempt to get the gun away from him. A struggle between the two ensued, during which the complainant never had control of the gun. During this struggle, defendant kept his finger on the trigger. At some point during the struggle, the gun fired into the complainant's left shoulder. The complainant was then able to grab the gun from defendant. The woman with defendant took the gun from the complainant and moved toward the exit. Defendant then ran to the gas station exit, whereupon the woman with defendant gave him back the gun. Defendant then got into his car, and the child followed him out, climbing into defendant's car with him. The complainant was taken to the hospital, where she spent several days being treated for a shattered shoulder, including undergoing surgery.

At defendant's preliminary examination, surveillance footage was shown detailing the incident. Defendant objected to the court binding him over on the two charges of intentionally discharging a firearm, asserting that he did not intentionally fire a weapon at the complainant. With regard to the remaining charges (including the ethnic-intimidation charge), defendant conceded that there were "questions of fact for a jury[.]" Relevant to the appeal at hand, the district court ruled that "transgender" fell within the statutory definition of "gender" for purposes of the ethnic-intimidation charge.

In the trial court, defendant moved to quash the district court's decision to bind him over on the two charges of intentionally discharging a firearm in a building and the charge of ethnic intimidation. With respect to the ethnic-intimidation charge, defendant argued that the prosecution failed to demonstrate that defendant committed a malicious physical act accompanied by a specific intent to harass the complainant because of her gender. In his amended motion to quash, defendant further contended that the ethnic-intimidation statute does not apply to situations involving transgender people. The trial court granted defendant's motion to quash, finding that with respect to ethnic intimidation, the preliminary-examination testimony established that the complainant, not defendant, caused the physical contact between the two by grabbing defendant's wrist. The trial court

-2-

further concluded that because the term "gender" is defined[] in the Michigan Penal Code[] as including only masculine, feminine, and neuter genders, the ethnic-intimidation statute did not apply to protect transgender people. [*People v Rogers*, 331 Mich App 12, 16-19; 951 NW2d 50 (2020) (footnotes omitted).]

This Court granted the prosecution leave to appeal[1] the trial court's order granting defendant's motion to quash and challenging the trial court's dismissal of the ethnic-intimidation charge, MCL 750.147b. This Court affirmed the trial court's order, concluding that although the trial court had employed erroneous reasoning, the trial court nonetheless reached the correct result, albeit for the wrong reasons. *Rogers*, 331 Mich App at 16. Thereafter, the United States Supreme Court issued its decision in *Bostock*, __ US __; 140 S Ct 1731 (2020), and the Michigan Supreme Court subsequently vacated the judgment of this Court and remanded this case to us for reconsideration in light of *Bostock*. See *People v Rogers*, 506 Mich 949 (2020).

## II. ANALYSIS

### A. STANDARD OF REVIEW

We review a trial court's decision regarding a motion to quash an information for an abuse of discretion. *People v March*, 499 Mich 389, 397; 886 NW2d 396 (2016); *People v Dowdy*, 489 Mich 373, 379; 802 NW2d 239 (2011). An abuse of discretion occurs when the trial court's decision falls outside the range of reasonable and principled outcomes. *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). To the extent that a trial court bases its decision regarding a motion to quash an information on an interpretation of the law, we review that interpretation de novo. *March*, 499 Mich at 397. Whether a defendant's conduct falls within the scope of a criminal statute is a question of statutory interpretation, which we also review de novo. *People v Flick*, 487 Mich 1, 8-9; 790 NW2d 295 (2010). When a trial court makes an error of law, it necessarily abuses its discretion. *People v Duncan*, 494 Mich 713, 723; 835 NW2d 399 (2013).

### B. MCL 750.147b

The prosecution contends that the trial court erred by dismissing the charge of ethnic intimidation asserted against defendant under MCL 750.147b. That statute provides, in pertinent part:

(1) A person is guilty of ethnic intimidation if that person maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin, does any of the following:

(a) Causes physical contact with another person.

(b) Damages, destroys, or defaces any real or personal property of another person.

---

[1] *People v Rogers*, unpublished order of the Court of Appeals, entered November 16, 2018 (Docket No. 346348).

(c) Threatens, by word or act, to do an act described in subdivision (a) or (b), if there is reasonable cause to believe that an act described in subdivision (a) or (b) will occur.  [MCL 750.147b.]

Before the trial court, defendant moved to quash the ethnic-intimidation charge, arguing in part that the prosecution failed to demonstrate that defendant had the specific intent to harass the complainant because of her gender.  Defendant further argued that the ethnic-intimidation statute does not apply to situations involving transgender people.  The trial court agreed in part, concluding that because the term "gender" is defined in the Michigan Penal Code as including only masculine, feminine, and neuter genders, the ethnic-intimidation statute did not apply to protect transgender people.

The goal of statutory interpretation is to discern and give effect to the intent of the Legislature.  See *Dowdy*, 489 Mich at 379.  If a statute's language is clear and unambiguous, we enforce the language as written, and judicial construction is neither required nor permitted.  *People v Gardner*, 482 Mich 41, 50; 753 NW2d 78 (2008).  The word "gender" is not specifically defined within MCL 750.147b.  The trial court in this case therefore considered the word "gender" as defined in the Penal Code, at MCL 750.10, and concluded that as defined in that section the word "gender" does not include "transgender."

We conclude that the trial court was misguided in relying on that provision to conclude that transgender is not a part or subset of "gender" for purposes of the ethnic-intimidation statute.  MCL 750.10 states, in relevant part, that "[t]he masculine gender includes the feminine and neuter genders."  MCL 750.10 provides grammatical clarity and miscellaneous definitions for the entirety of the Michigan Penal Code.  This Court has long ago and consistently recognized that the legislative intent in enacting MCL 750.10 was to clarify that the penal code did not apply only to men, but also to women and persons of neither male nor female sex, even when only masculine pronouns are used.[2]  See *People v Gilliam*, 108 Mich App 695, 700; 310 NW2d 843 (1981) (stating that the gender provision in MCL 750.10 "indicates a clear legislative intent that the Penal Code apply to females as well as males"); *People v Ghosh*, 188 Mich App 545, 546-547; 470 NW2d 497 (1991) (stating that MCL 750.10 provides that the Michigan Penal Code "applies to both men and women").  Thus, MCL 750.10 establishes only a rule of grammar intending to explain that persons of the male sex are not the *only* people subject to the Michigan Penal Code.  We therefore conclude that the trial court erred in finding that the provisions of MCL 750.10 establish a substantive, strictly limited definition of "gender," to be used throughout the Penal Code.

We next consider whether intimidation on the basis of a person's "gender" in the ethnic-intimidation statute, which was enacted in 1988, includes intimidation on the basis that a person is transgender.  When a statute specifically defines a term, that definition controls.  *People v Lewis*, 302 Mich App 338, 342; 839 NW2d 37 (2013).  In addition, the terms of a statute must be

---

[2] This Court notes that the other definitions listed in MCL 750.10 address similar grammatical rules of broad inclusion such as "The singular number includes the plural and the plural includes the singular," and "The words 'person', 'accused', and similar words include, unless a contrary intention appears, public and private corporations, copartnerships, and unincorporated or voluntary associations."

interpreted "on the basis of their ordinary meaning and the context in which they are used." *Id*., quoting *People v Zajaczkowski*, 493 Mich 6, 13; 825 NW2d 554 (2012). When a term is not defined in a statute, we may consult the dictionary definition of the term. *Lewis*, 302 Mich App at 342.

The word "gender" is not defined within the ethnic-intimidation statute, and we therefore may consult dictionary definitions of the word to determine what is included within its meaning. Because the statute was enacted into law in 1988, however, it is our task to determine what the word meant at the time the statute was adopted, not what it might mean more than 30 years following the statute's enactment. See *In re Certified Question*, 499 Mich 477, 484; 885 NW2d 628 (2016) ("it is best to consult a dictionary from the era in which the legislation was enacted. . . ."); see also *Cain v Waste Mgt, Inc (After Remand)*, 472 Mich 236, 247; 697 NW2d 130 (2005) (looking to dictionary definitions from the era of the original legislation in construing the meaning of an undefined statutory term).

We therefore "orient ourselves to the time of the statute's adoption, here [1988], and begin by examining the key statutory terms in turn before assessing their impact [in this case] and then confirming our work against this Court's precedents." *Bostock*, ___ US at ___; 140 S Ct at 1738-1739. To do otherwise would allow a statute's meaning to change not as a result of statutory amendment, but rather by judicial fiat based upon evolving societal understandings of a statutory term or terms. Moreover, in doing so "we would deny the people the right to continue relying on the original meaning of the law they have counted on to settle their rights and obligations." *Id*. at 1738, citing *New Prime Inc v Oliveira*, ___ US ___; 139 S Ct 532, 538-539; 202 L Ed 2d 536 (2019).

Although a contemporary understanding of the term "gender" includes gender identity and transgender, MCL 750.147b was not enacted in the era of these contemporary understandings. Rather, the people's representatives in the Legislature enacted this statute in 1988, and it took effect on March 30, 1989. What, then, was the common understanding of the term "gender" when the Legislature criminalized ethnic intimidation? Webster's Ninth New Collegiate Dictionary, published in 1990, gives a one-word definition of the word gender, as follows: "SEX." This is the only definition given of the word in noun form that bears upon sexual identity, the others relating to the grammatical meaning of the term. The Random House College Dictionary, published in 1988, after likewise defining the word as a grammatical term, gives the same one-word definition: "sex." Both dictionaries then illustrate this meaning by using the word in a phrase involving "the feminine gender." The Webster's dictionary previously referenced first defines "sex" as, "either of two divisions of organisms distinguished respectively as male or female." At the time the statute was enacted, therefore, the term "gender" was synonymous with sex, being the biological roles of male and female.

That this was the common understanding of the term "gender" at the time the statute was enacted is further illustrated by a 1993 opinion of this Court. In *Barbour v Dep't of Social Services*, 198 Mich App 183; 497 NW2d 216 (1993), this Court upheld the trial court's dismissal of the plaintiff's claim that he was unlawfully discriminated against in his employment on the basis of his sexual orientation. Plaintiff brought his claim under the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101, *et seq*., which prohibits various forms of discrimination on the basis of "sex." The Court held that "harassment or discrimination based upon a person's sexual orientation

is not an activity proscribed by the act." *Barbour*, 198 Mich App at 185. The Court went on to state, "Plaintiff has failed to meet the requirement that the harassment be *gender-based*." *Id*. at 186 (emphasis added).

The Court in *Barbour* also relied upon its review of federal case law interpreting Title VII of the federal Civil Rights Act of 1964, 42 USC 2000e *et seq*., which similarly prohibits discrimination on the basis of "sex," concluding that Title VII's "protections are aimed at *gender* discrimination, not discrimination based on sexual orientation." *Barbour*, 198 Mich App at 185 (emphasis added). Although *Bostock* has since dispelled that conclusion as a misconception, this Court in *Barbour* in 1993 used the term "gender" interchangeably with the statutory term "sex," suggesting an understanding at that time that gender meant sex, and was understood to denote biological sex. The term gender, it would seem, would not have been understood to encompass transgender when the statute was enacted in 1988.

## C. *BOSTOCK*

In *Bostock*, the Supreme Court considered whether Title VII of the Civil Rights Act of 1964, § 703(a)(1), 42 USCA § 2000e-2(a)(1), which precludes discrimination against an individual "because of his. . .sex . . ." includes discrimination against homosexual and transgender persons. The Court specifically addressed "whether an employer can fire someone simply for being homosexual or transgender" under Title VII, and concluded that "[a]n employer who fires an individual for being homosexual or transgender fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision, exactly what Title VII forbids." *Bostock*, ___ US at ___; 140 S Ct at 1737.

The Court assumed for purposes of that discussion that "sex" referred "only to biological distinctions between male and female," but posited that the question was not merely what "sex" meant, "but what Title VII says about it." *Id*. at 1739. The *Bostock* Court found that from the "ordinary public meaning of the statute's language at the time of the law's adoption, a straightforward rule emerges: An employer violates Title VII when it intentionally fires an individual employee based in part on sex." *Id*. at 1741. "If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Id*.

The *Bostock* Court acknowledged that "homosexuality and transgender status are distinct concepts from sex," but that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex; the first cannot happen without the second." *Id*. at 1746-1747. The Court concluded that "[f]or an employer to discriminate against employees for being homosexual or transgender, the employer must intentionally discriminate against individual men and women in part because of sex." *Id*. at 1743 (quotation marks and citation omitted).

We observe initially that federal laws and regulations are not binding upon a Michigan court interpreting a Michigan statute. *Penden v Detroit*, 470 Mich 195, 217; 680 NW2d 857 (2004). And "[w]hile federal precedent may often be useful as guidance in this Court's interpretation of laws with federal analogues, such precedent cannot be allowed to rewrite Michigan law. The persuasiveness of federal precedent can only be considered after the statutory

differences between Michigan and federal law have been fully assessed, and, of course, even when this has been done and language in state statutes is compared to similar language in federal statutes, federal precedent remains only as persuasive as the quality of its analysis." *Garg v Macomb Co Comm Mental Health Serv*, 472 Mich 263, 283; 696 NW2d 646 (2005). See also *Huggett v Dep't of Natural Resource*s, 464 Mich 711, 721-722; 629 NW2d 915 (2001) (rejecting this Court's reliance, in determining the scope of a Michigan statutory provision, upon an analogous, similarly worded provision of a federal statute, and concluding that federal law need not be considered when the intent of the Michigan Legislature could be determined from the Michigan statute itself.) See also *Sharp v City of Lansing*, 464 Mich 792, 803; 629 NW2d 873 (2001) (federal case law is not binding precedent and is only persuasive authority in resolving a question of state law). See also *Chmielewski v Xermac, Inc*, 457 Mich 593, 601-602; 580 NW2d 817 (1998) (when interpreting provisions of Michigan's Persons with Disabilities Civil Rights Act, the analogous federal precedents are persuasive, but not binding.)

In *Bostock*, Justice Alito, joined by Justice Thomas, filed a lengthy dissenting opinion, beginning: "There is only one word for what the Court has done today: legislation. The document that the Court releases is in the form of a judicial opinion interpreting a statute, but that is deceptive." *Bostock*, ___ US at ___; 140 S Ct at 1754 (ALITO, J., dissenting). He went on to state, "[m]any will applaud today's decision because they agree on policy grounds with the Court's updating of Title VII. But the question in these cases is not whether discrimination because of sexual orientation or gender identity *should be* outlawed. The question is *whether Congress did that in 1964*. It indisputably did not." *Id*. at 1756 (ALITO, J., dissenting).

In its application to this case, we accord *Bostock* respectful consideration as we parse the meaning of Michigan's ethnic-intimidation statute. But following the precedents of our Supreme Court, we must conclude that *Bostock* does not control the outcome of this case. See *Garg*, 472 Mich at 283. *Bostock* interpreted a federal civil employment discrimination statute adopted by Congress in 1964. We are tasked with interpreting the meaning of a state criminal statute enacted in 1988. Thus, we are not in this case comparing a state statute with an analogous federal statute. Moreover, the federal interpretation of an analogous federal statute would not control our interpretation of a Michigan statute, even under the most expansive reading of the US Constitution's supremacy clause. Although *Bostock* might offer helpful guidance, we are bound by Michigan precedent to conclude that "such precedent cannot be allowed to rewrite Michigan law." *Garg*, 472 Mich at 283.

Having said that, we observe that if this Court substitutes the word "sex" for "gender" in MCL 750.147b(1)(a), the language of the statute is similar to 42 USC 2000e-2(1)(a), though the latter is an employment discrimination statute. 42 USC 2000e-2(1)(a) prohibits certain forms of discrimination "against any individual . . . because of such individual's race, color, religion, sex, or national origin[.]" MCL 750.147b(1)(a) prohibits a person from causing physical contact with another person "maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin. . . ." Title VII uses the word "individual" instead of "person," and Title VII uses the word "sex" as opposed to "gender."

-7-

We acknowledge that gender and sex are not now defined as synonymous, although, as discussed, they were defined as such in 1988.[3] However, as observed by the *Bostock* Court, they are often inextricably intertwined. In this matter, defendant's alleged conduct targeted the complainant because she was biologically male at birth, but did not match defendant's expectations of how a man should appear or behave. Presumably, were it not for the complainant's biological sex (male), defendant would not have harassed and intimidated her. Because the defendant allegedly harassed and intimidated the complainant because he believed her to be male, and based his intimidating conduct on that belief, we need not reach the question whether the statute's use of the term gender in 1988 was intended to include the term transgender. Defendant's actions were gender-based within the "traditional" understanding of that term, and harassing someone on the basis of their male gender (whether perceived or actual) falls within the prohibitions of the statute. It furthermore would not matter if the defendant had been mistaken in his perception of the complainant's gender or biological sex, because the test under the statute is subjective; a defendant is guilty of ethnic intimidation if the defendant intimidates an individual "because of" that individual's gender, whether rightly or wrongly perceived.[4]

Our role is to effectuate the intent of the Legislature. Applying the term "gender" in any sense, whether it is interpreted as equating with "sex" or given a broader meaning, defendant engaged in harassment and intimidation of the complainant based on her gender. As enacted, MCL 750.147b prohibits intimidation and harassment because of gender. A plain reading of the statute would dictate that, whenever a complainant's gender was the impetus for the intimidating or harassing behavior, the conduct falls within the ethnic-intimidation statute. We conclude that

---

[3] Various dictionaries define "gender" in different ways. For example, *Merriam-Webster's Collegiate Dictionary* (11th ed) (2014), defines "gender" in part, as "the behavioral, cultural, or psychological trait typically associated with one sex." *Oxford's English Dictionary* (3rd ed) (2010) provides a similar definition of gender, but expounds further upon its definition. This dictionary defines gender as "Either of the two sexes (male and female), especially when considered with reference to social and cultural differences rather than biological ones. The term is also used more broadly to denote a range of identities that do not correspond to established ideas of male and female." It also clarifies that the words "sex" and "gender" often mean different things and are used differently: "Although the words gender and sex are often used interchangeably, they have slightly different connotations; sex tends to refer to biological differences, while gender more often refers to cultural and social differences and sometimes encompasses a broader range of identities than the binary of male and female[.]" [*Oxford's English Dictionary* (3rd ed).]

[4] Another passage from Justice Alito's dissenting opinion is instructive in the application of the Michigan ethnic intimidation statute to the facts at hand in this case. Justice Alito posited, "Contrary to the Court's contention, discrimination because of sexual orientation or gender identity does not in and of itself entail discrimination because of sex. We can see this because it is quite possible for an employer to discriminate on those grounds without taking the sex of an individual applicant or employee into account." *Bostock*, ___ US at ___; 140 S Ct at 1758 (ALITO, J., dissenting). Such was not the case here, however. Defendant knew, or at least thought he knew, the complainant's biological sex, and intimidated her on that basis. The Michigan statute prohibits such conduct, without reference to the fact the complainant in this case was transgender.

recognizing that the complainant here was targeted because of her gender effectuates the Legislature's intent.

## D. BINDOVER

We therefore consider whether the trial court abused its discretion in granting defendant's motion to quash his bindover on the ethnic-intimidation charge, and conclude that it did. "The purpose of a preliminary examination is to determine whether a crime was committed and whether there is probable cause to believe that the defendant committed it." *People v Taylor*, 316 Mich App 52, 58; 890 NW2d 891 (2016). To support a bindover of defendant on the charge of ethnic intimidation, the prosecution must have established probable cause to believe that defendant:

maliciously, and with specific intent to intimidate or harass another person because of that person's race, color, religion, gender, or national origin, does any of the following:

(a) Causes physical contact with another person.

(b) Damages, destroys, or defaces any real or personal property of another person.

(c) Threatens, by word or act, to do an act described in subdivision (a) or (b), if there is reasonable cause to believe that an act described in subdivision (a) or (b) will occur. [MCL 750.147b(1)]

"Malice" generally is defined in a criminal context as the "intent, without justification or excuse, to commit a wrongful act[,]" a "[r]eckless disregard of the law or of a person's legal rights," or "ill will." *People v Harris*, 495 Mich 120, 136; 845 NW2d 477 (2014), quoting *Black's Law Dictionary* (9th ed). In this case, the specific intent required would be that described in the statute: to intimidate or harass the complainant because of her "gender." MCL 750.147b(1). Here, the preliminary examination testimony established probable cause to believe that defendant acted maliciously and with specific intent to harass the complainant on account of her gender. Defendant's words and conduct were predicated on his belief that the complainant was biologically male.

The trial court also determined that the prosecution did not establish probable cause to believe that defendant's intent to intimidate or harass the complainant on account of her gender caused physical contact with the complainant, as required under MCL 750.147b(1)(a). Because the statute does not provide a definition of "cause," consulting dictionary definitions is proper. *Lewis*, 302 Mich App at 342. *Black's Law Dictionary* (11th ed), defines "cause" as "[t]o bring about or effect[.]" *Merriam-Webster's Collegiate Dictionary* (11th ed) defines a "cause" as a "reason for an action or condition[,]" or "something that brings about an effect or a result[.]"

Here, defendant engaged in harassment and intimidation of the complainant based on her gender. He showed her a loaded gun and threatened to kill her, causing her to fear for her life. While the complainant initiated the first physical contact by grabbing defendant's arm, the statute requires that the defendant "causes" physical contact; the statute does not require that the defendant be the person to initiate the physical contact. MCL 750.147b(1)(a). The complainant's testimony provides support for the conclusion that defendant caused physical contact by placing her in fear

for her life causing her to struggle for the gun.  Thus, the trial court erred in concluding that there was no probable cause to believe that that defendant caused physical contact with the complainant.

We reverse the trial court's order granting defendant's motion to quash the ethnic-intimidation charge, reinstate the ethnic-intimidation charge, and remand to the trial court for further proceedings consistent with this opinion.  We do not retain jurisdiction.


/s/ Michael F. Gadola
/s/ James Robert Redford