*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

DAN MARTIN,

　　　　　　Plaintiff-Appellant,

v

CITY OF FLAT ROCK FIRE DEPARTMENT and
CITY OF FLAT ROCK,

　　　　　　Defendants-Appellees.

UNPUBLISHED
March 17, 2026
9:32 AM

No. 372830
Wayne Circuit Court
LC No. 22-014693-CD

Before: PATEL, P.J., and SWARTZLE and MARIANI, JJ.

PER CURIAM.

Plaintiff appeals by right the trial court's order granting summary disposition in favor of defendants City of Flat Rock Fire Department (the fire department) and the City of Flat Rock (the city) under MCR 2.116(C)(10) in this employment action involving allegations of retaliation in violation of the Elliott-Larsen Civil Rights Act (ELCRA), MCL 37.2101 *et seq*. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In 2009, plaintiff began working at the fire department as a part-time paid on-call firefighter and paramedic. From 2014 to 2019, plaintiff was the vice president of the fire department's union.

In January 2018, plaintiff was involved in an incident with the president of the union, Timothy Webb. While plaintiff and Webb were on an emergency run, Webb claimed that plaintiff lost track of items, threw medical equipment at him, and pinched Webb's fingers in the backboard while moving the patient. After the fact, Webb confronted plaintiff about the incident. Plaintiff maintained that he simply tossed the equipment. Plaintiff then accused Webb of being an unsafe driver, which prompted Webb to shout obscenities at plaintiff. Webb later apologized to plaintiff. Another coworker, Justus Walden, witnessed the incident. Webb and Walden reported the incident to Fire Chief William Vack on the date of the incident, and they each provided a written statement.

On January 5, 2018, plaintiff met with Fire Chief Vack, the city administrator, and the human resources manager. Plaintiff recapped his conversations from that meeting in a January 6, 2018 memorandum. Plaintiff claimed that Webb became angry with plaintiff after they completed

-1-

a cardiac arrest call in January 2018. Plaintiff stated that Webb yelled obscenities at him, and plaintiff was concerned that a physical altercation would occur. Plaintiff called Assistant Fire Chief Mark Hammond to defuse the incident but was unable to reach him. Plaintiff noted that Webb apologized to him but maintained Webb's behavior was "a repeating occurrence." Plaintiff asserted that Assistant Fire Chief Hammond witnessed Webb's aggressive behavior in August 2017 when he intervened to stop Webb's "near physical attack" on plaintiff. Plaintiff also claimed that he witnessed Webb "completely lose his temper" on more than four occasions, including three separate incidents where Webb yelled and swore at three other fire department employees. Plaintiff maintained that he was seeking help for Webb and other employees who had anger management issues, stating, "I can detect stress and the need for help when I see it."

On June 21, 2018, Richard Cadoura, a former employee of the fire department, filed a lawsuit against defendants alleging violations of the Whistleblowers' Protection Act (WPA), MCL 15.369 *et seq.* Plaintiff was not named in the lawsuit, but he was included on both Cadoura's and defendants' witness lists along with several dozen employees of the city and the fire department.

In October 2018, Sergeant Raymond Rich reported that he found a pornographic website on the fire department's computer and plaintiff's login information associated with that website. The investigation revealed that plaintiff allegedly downloaded the pornography on his phone and then it was transferred onto the computer when plaintiff plugged his phone into the computer. Plaintiff denied viewing porn on the department's computer, and there was no evidence that he did. The city's administrator, Brian Marciniak, told Fire Chief Vack that plaintiff should be fired for the incident. But Marciniak did not have authority to discipline the firefighters. Fire Chief Vack issued plaintiff a verbal warning.

In December 2018, it was reported that plaintiff slept through a dispatch call while he was on duty. One of the firefighters attempted to wake plaintiff to no avail. The other firefighters responded to the medical run in the ambulance. Plaintiff later arrived at the scene in a staff vehicle. Sergeant Rich and Lieutenant Kenneth Laird conducted an investigation of the incident. Plaintiff maintained that he did not hear the dispatch call because he had insomnia and had been sick that week. Fire Chief Vack noted that a firefighter sleeping through a dispatch call could endanger the safety of the city's residents. Plaintiff was issued a verbal warning for the incident.

In January 2019, plaintiff started to exit a fire department vehicle before he put the gear in park or applied the parking brake. The vehicle rolled toward firefighter Bill Metzger. Metzger stepped out of the vehicle's path, but the vehicle allegedly came within a few feet of striking the ambulance that was occupied by a patient and crew before plaintiff stopped it. Metzger reported the incident to Fire Chief Vack. He also stated:

> I personally have had several incidents with FF Martin in the recent past where he seems to be "out of it" in my opinion. He is very hard to understand most times when he speaks as if he is mumbling or something. He does not speak clearly and I have seen multiple patients have hard time understanding him. None of my past issues with him have been documented prior to this incident. I am not trying to intrude in his personal life or make any suggestions. I am however concerned for the safety and well-being of myself, my crews, this department and our customers. I do not know if there is medical reason, medication issue or personal life situation

causing these issues but I feel I must document this incident and ask that something be looked into.

Metzger maintained that he had reported issues about plaintiff to Lieutenant Laird and Fire Chief Vack on several occasions but "they were never dealt with." After the situation with the vehicle, Metzger believed "it had become severe enough" that it needed to be "documented and looked into."

Plaintiff maintained that he had no recollection of the vehicle incident but did not deny that it happened. Fire Chief Vack was concerned that plaintiff endangered Metzger with his actions. Plaintiff was issued a verbal warning, and the matter was referred to Lieutenant Laird to conduct additional driver's training.[1]

Fire Chief Vack recommended that plaintiff undergo physical and psychological evaluations on the basis of his own observations as well as concerns reported to him by Sergeant John Rose, Sergeant Rich, Metzger, and other firefighters. These concerns included: plaintiff failed to pay attention to details, acted strangely, had slurred/mumbled speech, had issues maintaining his train of thought during a conversation, was taking numerous medications that appeared to alter his mental status, embellished stories, authored reports that did not make sense, had driving issues, provided inaccurate patient histories, and behaved erratically. Fire Chief Vack expressed that he was concerned about plaintiff's physical and mental health as well at the city's and fire department's liability exposure.

On May 8, 2019, plaintiff was informed that he was being placed on administrative leave because of concerns regarding his physical health and wellbeing. He was placed on administrative leave pending the outcome of a urine and blood screen, fit for duty physical, and mental health evaluation. Plaintiff was directed to report to Dr. David Patterson's office on May 9, 2019, for a urine and blood screen, and to Dr. Thomas Clark's office on May 14, 2019, for a psychological evaluation.

On May 14, 2019, and May 16, 2019, Dr. Clark performed a psychological assessment and evaluation of plaintiff. Dr. Clark noted that plaintiff was "somewhat dishevelled [sic] and unkempt" and made the following observations:

> While he was generally oriented in all four spheres (time, place, person, situation), recent and remote memory appear impaired in some areas; his affect and emotional reactions also revealed some major anxiety and depression. His physical/bodily hygiene was poor, and there was a distinct body odor noted. In addi-tion [sic], the examiner noted (and Mr. Martin admitted to having) problems with focusing, concentration, and short-term/long-term memory issues (both on and off the job), and the examiner often had to repeat things for him. He also reported energy and fatigue problems. All of these could hamper his performance in carrying out the essential functions of a firefighter/paramedic on the job. . . . He manifested some

---

[1] The verbal warnings for the computer incident, the oversleeping incident, and the vehicle incident were all given at the same time in February 2019 in the presence of a union representative.

-3-

confusion at times and tended to jump from subject to subject without being aware of having done so, while also slurring some words and mistaking some words for others. While Mr. Martin was generally relevant, coherent, and cooperative at times, he was difficult to follow due to some tangentiality in his thinking; he also tended to mumble on occasion during the interview, making him difficult to hear and understand.

Plaintiff also reported a 15-year history of sleep issues that had deteriorated over the last three years, and an ongoing battle with obesity.

Dr. Clark conducted psychodiagnostic testing. Plaintiff tested below average for emotional stability and self-discipline. These scores indicated that he could be easily upset, overly emotional, impulsive, undisciplined, and/or uncontrolled. Dr. Clark stated, "Individuals with Mr. Martin's scores tend to be rigid and inflexible in problem-solving and also have a poor tolerance for stress and pressure—which could strongly affect his performance on the job." Test scores further revealed that plaintiff's abstract thinking and reasoning ability were below average, and his critical thinking capability was well below average. Dr. Clark opined that plaintiff's deficiencies in these areas were "likely to affect his job performance." Test scores also demonstrated that plaintiff was "experiencing and exhibiting psychological dysfunction of a moderate to severe nature." Additional testing revealed the "possibility of some underlying brain dysfunction," which Dr. Clark opined "could also be implicated in his short/long memory focusing, confusion, and concentration problems seen both in [the] interview and on his tests." Dr. Clark recommended extensive neuropsychological testing, a referral to a neurologist, and diagnostic testing to rule out possible underlying brain and neurological issues.

Dr. Clark expressed "clear concerns as to whether [plaintiff] ought to continue working in his present job capacity at the present time, since his ability to perform the essential job functions of a firefighter and paramedic may be seriously compromised by his symptoms." Dr. Clark opined that plaintiff was "not presently a danger to himself and/or others; however, he could become so if his emotional supports and symptoms were to deteriorate or go any further downhill." Dr. Clark opined that plaintiff was "<u>not</u> able to perform the essential job functions of a firefighter/paramedic at this time and <u>should not return to work</u>" until after he complied with the recommendations. Those recommendations included a full neuropsychological test battery to rule out an underlying brain dysfunction and referral to a neurologist if the results were positive. If the neuropsychological testing did not reveal significant issues, Dr. Clark recommended a minimum of 12 psychotherapy sessions with a therapist,[2] monthly attendance and progress reports from the treating therapist, a consultation with his physician regarding antidepression medication, and a reexamination with Dr. Clark before returning to work.

Relying on Dr. Clark's medical opinion that plaintiff was not fit for duty, Fire Chief Vack determined that plaintiff should remain on administrative leave. It was Fire Chief Vack's understanding that Dr. Clark discussed the additional testing and treatment recommendations with plaintiff. Fire Chief Vack did not inform plaintiff that he needed to schedule the examinations

---

[2] Dr. Clark recommended that plaintiff undergo "at least 10-12 sessions and [obtain the] therapist['s] permission before any consideration is given to a possible return to work[.]"

recommended by Dr. Clark, did not know whether anyone else from the fire department had a conversation with plaintiff about Dr. Clark's recommendations, and did not recall whether any attempts were made to have plaintiff reevaluated by Dr. Clark. Plaintiff contended that he checked his mailbox at the fire department in May or June of 2019 for notices but did not receive any at that time. He also believed that he made one attempt to call Fire Chief Vack to obtain a status. However, plaintiff admitted that he did not have a specific recollection of calling Fire Chief Vack.

Plaintiff allegedly did not receive a copy of Dr. Clark's report until September 2019.[3] By then, plaintiff was working full-time for Rapid Response. Plaintiff did not follow through with any of Dr. Clark's recommendations. Because Fire Chief Vack did not receive a report from a psychologist or a psychiatrist indicating that plaintiff was competent to return to work, plaintiff was not called back to work. According to plaintiff, the city terminated him in December 2019, backdated to May 8, 2019, because he allegedly falsely asserted that he was unemployed when he filed his claim for unemployment benefits.

In December 2022, plaintiff commenced this action alleging that he engaged in protected activity by filing work-related grievances regarding Webb's aggressive and hostile behavior and by supporting Cadoura's harassment and discrimination claim against defendants. Plaintiff asserted that defendants violated the ELCRA by terminating him in retaliation for engaging in the protected activity. Following discovery, defendants moved for summary disposition under MCR 2.116(C)(8) and (10) arguing that plaintiff could not establish prima facie case of retaliation under the ELCRA. Defendants further asserted that there were legitimate reasons for placing plaintiff on leave and ultimately terminating his employment. In response, plaintiff argued that the evidence viewed in the light most favorable to plaintiff established a prima facie case of retaliation and defendants' proffered legitimate reason for placing him on administrative leave was pretextual. Plaintiff maintained that defendants' failure to ensure that plaintiff received Dr. Clark's report was evidence that the evaluation was merely a tool to put plaintiff on leave.

Construing the evidence in the light most favorable to plaintiff, the trial court concluded that the evidence was sufficient to support a prima facie case of retaliation. But because plaintiff failed to establish a genuine issue of material fact whether defendants had a legitimate reason to terminate plaintiff, the trial court granted summary disposition to defendants. The trial court entered an order granting defendants' motion for the reasons stated on the record.

Plaintiff now appeals.

---

[3] Plaintiff applied for unemployment on May 24, 2019. The Michigan Employment Security Commission determined that he was ineligible and denied the claim. Plaintiff appealed the decision. During the appeal, he received a copy of Dr. Clark's report in September 2019.

## II. STANDARD OF REVIEW

"We review de novo a trial court's decision on a motion for summary disposition." *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). "Where a motion for summary disposition is brought under both MCR 2.116(C)(8) and (C)(10), but the parties and the trial court relied on matters outside the pleadings, as is the case here, MCR 2.116(C)(10) is the appropriate basis for review." *Silberstein v Pro-Golf of America, Inc*, 278 Mich App 446, 457; 750 NW2d 615 (2008). Summary disposition under MCR 2.116(C)(10) is warranted when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." MCR 2.116(C)(10). "A genuine issue of material fact exists when the record leaves open an issue upon which reasonable minds might differ." *El-Khalil*, 504 Mich at 160 (cleaned up). When reviewing a motion for summary disposition under MCR 2.116(C)(10), a court must consider the evidence submitted by the parties in the light most favorable to the nonmoving party. *Id*. A trial court may not assess the credibility of witnesses or make factual findings on a motion for summary disposition. *White v Taylor Distrib Co, Inc*, 482 Mich 136, 142; 753 NW2d 591 (2008). Summary disposition should be granted when, after reviewing the evidence in the light most favorable to the nonmoving party, there are no remaining issues of material fact and the moving party is entitled to judgment as a matter of law. *Lowrey v LMPS & LMPJ, Inc*, 500 Mich 1, 5; 890 NW2d 344 (2016).

## III. ELCRA RETALIATION CLAIM

Plaintiff argues that he established the prima facie elements of an ELCRA retaliation claim and that defendants' proffered legitimate reason for the employment action was purely pretextual. We disagree.

At the time that plaintiff commenced this action, MCL 37.2202(1)(a), as amended by 2009 PA 190, provided that an employer shall not "[f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." The ELCRA also directs that a person or entity shall not "[r]etaliate or discriminate against a person because the person has opposed a violation of this act, or because the person has made a charge, filed a complaint, testified, assisted, or participated in an investigation, proceeding, or hearing under this act." MCL 37.2701(a). This Court has observed that the purposes of the retaliation provisions of the ELCRA are "to protect access to the machinery available to seek redress for civil rights violations and to protect operation of that machinery once it has been engaged." *DeFlaviis v Lord & Taylor, Inc*, 223 Mich App 432, 440; 566 NW2d 661 (1997) (citation omitted).

A plaintiff must prove the following elements to establish a prima facie case of retaliation under ELCRA: "(1) that he engaged in a protected activity; (2) that this was known by the defendant; (3) that the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *El-Khalil*, 504 Mich at 161 (cleaned up). There is no dispute that plaintiff suffered an adverse employment action when he was placed on administrative leave in May 2019 but the other elements are contested.

A "[p]laintiff cannot prevail on a claim of retaliation in violation of the CRA without establishing that he engaged in activity protected under the act." *Barrett v Kirtland Community College*, 245 Mich App 306, 318; 628 NW2d 63 (2001), overruled in part on other grounds by *Maldonado v Ford Motor Co*, 476 Mich 372, 388; 719 NW2d 809 (2006). Although an employee is not required to specifically cite the ELCRA when opposing a violation, "the employee must do more than generally assert unfair treatment. The employee's charge must clearly convey to an objective employer that the employee is raising the specter of a claim of unlawful discrimination pursuant to [ELCRA]." *Id*. at 319 (citations omitted).

Plaintiff's first theory is that defendants retaliated against him because he engaged in protected activity by filing work-related grievances regarding Webb's "repetitive dangerous behavior that was creating hostile work environment." In his January 2018 memo to Fire Chief Vack, plaintiff asserted that he was a victim of Webb's "near physical attack" in August 2017. Plaintiff also claimed that Webb became angry with plaintiff in January 2018, and plaintiff was concerned that a physical altercation would occur. Plaintiff further asserted that he witnessed Webb "completely lose his temper" on over four occasions, including three separate incidents where Webb yelled and swore at other fire department employees. Plaintiff did not reference a protected class or link Webb's behavior to any alleged protected status. Rather, plaintiff maintained that he was seeking help for Webb and other employees who had anger management issues, stating, "I can detect stress and the need for help when I see it." In addition, plaintiff testified that he submitted the memo with the intention that Webb would "get psychological help and treatment."

Plaintiff's complaints about Webb's behavior cannot be construed as a "charge" under the ELCRA. Although plaintiff was not required to cite the ELCRA in his complaints about Webb, he had to "do more than generally assert unfair treatment." *Id*. Viewing the evidence in the light most favorable to plaintiff, an objective employer could not conclude that plaintiff's complaints about Webb's behavior raised the specter of a claim under the ELCRA. See *id*. at 318-320. Thus, plaintiff failed to establish that he was engaged in a protected activity by complaining about Webb's behavior.

Plaintiff also alleged that defendants retaliated against him because he engaged in protected activity by supporting Cadoura's claims of racism and a hostile workplace. Plaintiff asserts that he began suffering harassment after defendants answered Cadoura's complaint. But plaintiff was not mentioned in Cadoura's complaint. Plaintiff further contends that he "participated" in Cadoura's lawsuit, citing Cadoura's witness list. Cadoura's February 2019 witness list included plaintiff as one of at least 40 "[r]epresentatives of and/or records' custodian of; employees and or former employees of" the city and the fire department. Plaintiff was also included on the defendants' witness list in Cadoura's case. Plaintiff's mere appearance on Cadoura's witness list was insufficient evidence to establish that he engaged in protected activity by opposing a violation of the ELCRA regarding Cadoura.

In July 2019, Cadoura was deposed in his own lawsuit. Cadoura testified that he was told by several of the firefighters that "nobody" at the fire department liked plaintiff. In 2017, one of the firefighters told Cadoura that he would "run into a lot of problems" if he was friends with plaintiff. Cadoura was not provided an explanation as to why plaintiff was not liked. When asked about persons who witnessed some of the events that Cadoura complained of, he identified

plaintiff. But he also identified several other firefighters as witnesses to events, including Lieutenant Laird who allegedly stated that one of the events "was completely inappropriate." Cadoura also testified that plaintiff warned him that the fire department would manipulate Cadoura's schedule because he was "cutting out on their overtime." After Cadoura was terminated, he contacted plaintiff in his capacity as the union vice president to obtain information regarding his termination. Plaintiff reached out to Assistant Fire Chief Hammond on Cadoura's behalf. Plaintiff reported to Cadoura that he was fired because he violated an article in the contract.

Plaintiff was not deposed in Cadoura's lawsuit, but he signed an affidavit in support of Cadoura's claim. Plaintiff averred that he "observed direct racism that [Cadoura] was forced to endure" and outlined the events he witnessed. Plaintiff further averred that he believed he was fired "at least in part" because he "help[ed] Mr. Cadoura out with his lawsuit." However, plaintiff's affidavit was prepared after he was terminated and thus it did not establish that he engaged in protected activity that led to adverse employment action.

There is no direct evidence that plaintiff engaged in protected activity by supporting Cadoura's claim before or during plaintiff's administrative leave.[4] When reviewing the circumstantial evidence to determine whether a genuine issue of material fact exists, we may not assess credibility, weigh evidence, or resolve factual disputes. *Skinner v Square D Co*, 445 Mich 153, 161; 516 NW2d 475 (1994); *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 437; 695 NW2d 84 (2005). "Instead, the court's task is to review the record evidence, and all reasonable inferences therefrom, and decide whether a genuine issue of any material fact exists to warrant a trial." *Skinner*, 445 Mich at 161. Viewing the evidence in a light most favorable to plaintiff as the nonmoving party, a trier of fact could reasonably infer from Cadoura's deposition testimony that plaintiff supported Cadoura's harassment and discrimination claim against defendants and thus engaged in protected activity.

Next, plaintiff must demonstrate that defendants knew of his protected activity. Fire Chief Vack testified that he could not recall the details of Cadoura's lawsuit, whether plaintiff was listed as a witness in support of Cadoura's claims, or whether plaintiff had information regarding Cadoura's claims. He stated, "I knew they were friends, but other than that, no." For purposes of summary disposition, we may not assess credibility or weigh the evidence. *Skinner*, 445 Mich at 161; *Hines*, 265 Mich App at 437. Viewing the evidence in a light most favorable to plaintiff as the nonmoving party, a trier of fact could reasonably infer that defendants had knowledge that plaintiff supported Cadoura's harassment and discrimination claim against defendants.

"The last element, causation, is usually difficult to prove." *Cuddington v United Health Servs, Inc*, 298 Mich App 264, 275; 826 NW2d 519 (2012). "Rarely will an employer openly

---

[4] Plaintiff also argued to the trial court, "Both [Cadoura and plaintiff] mentioned complaints about how the department staffed its shifts, handled overtime, promoted, and disciplined inappropriate behavior—and Plaintiff specifically implicated the City in the illegal staffing at the scene of a murder. Reporting of these complaints or issues counts as a separate form of protected activity." Plaintiff asserts the same argument on appeal. Although Cadoura asserted a retaliation claim in violation of the WPA, plaintiff did not. Therefore, this argument is not relevant to the issues in the present case.

admit having fired a worker in retaliation for exercising a right of employment." *Id*. at 276. "To establish causation, the plaintiff must show that his participation in activity protected by the CRA was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett*, 245 Mich App at 315. A causal connection must rely on "more than pure conjecture and speculation . . . ." *West v Gen Motors Corp*, 469 Mich 177, 188; 665 NW2d 468 (2003). Our Supreme Court has explained, "in order to show causation in a retaliatory discrimination case, '[p]laintiff must show something more than merely a coincidence in time between protected activity and adverse employment action.' " *Garg v Macomb Co Comm Mental Health Servs*, 472 Mich 263, 286; 696 NW2d 646 (2005), quoting *West*, 469 Mich at 186. "A causal connection can be established through circumstantial evidence, such as close temporal proximity between the protected activity and adverse actions, as long as the evidence would enable a reasonable fact-finder to infer that an action had a discriminatory or retaliatory basis." *Rymal v Baergen*, 261 Mich App 274, 303; 686 NW2d 241 (2004).

"Absent direct evidence of retaliation, a plaintiff must rely on indirect evidence of his or her employer's unlawful motivations to show that a causal link exists . . . ." *Debano-Griffin v Lake Co*, 493 Mich 167, 176; 828 NW2d 634 (2013). Establishing pretext or that retaliation was a motivating factor in an employer's decision can be accomplished in one of three ways: (1) by showing that the purported legitimate reasons for the decision had no basis in fact; (2) if the reasons have a basis in fact, by showing that they were not the actual factors motivating the decision; or, (3) if the reasons were factors, by showing that they were jointly insufficient to justify the decision. *Id*. at 180.

Plaintiff contends the mere fact that he had no history of discipline until Cadoura testified about plaintiff is sufficient to establish a causal connection. The temporal proximity between Cadoura's deposition and plaintiff's placement on administrative leave does not support plaintiff's arguments. Plaintiff was placed on administrative leave and evaluated by Dr. Clark *before* Cadoura was deposed. Thus, the evidence does not establish a causal connection between Cadoura's deposition and plaintiff's placement on administrative leave.

Plaintiff has also failed to demonstrate that Fire Chief Vack's decision to continue plaintiff's administrative leave was linked to plaintiff's support of Cadoura's claim. Fire Chief Vack recommended that plaintiff undergo physical and psychological evaluations on the basis of his own observations as well as concerns reported to him by other firefighters. Dr. Clark documented many of the same symptoms that Fire Chief Vack and other firefighters had reported. Psychodiagnostic testing revealed that plaintiff had deficiencies in several areas. Dr. Clark opined that the deficiencies were likely to affect plaintiff's job performance. Additional testing revealed the "possibility of some underlying brain dysfunction." Dr. Clark opined that plaintiff's "ability to perform the essential job functions of a firefighter and paramedic may be seriously compromised by his symptoms." Dr. Clark further opined that plaintiff was "<u>not</u> able to perform the essential job functions of a firefighter/paramedic at this time and <u>should not return to work</u>" until after he complied with Dr. Clark's recommendations.

Plaintiff simply relies on speculation and conjecture to demonstrate a causal connection between his support of Cadoura's claim (i.e., the protected activity) and the decision to continue

his administrative leave (i.e., the adverse employment action).[5]  Plaintiff has not presented any evidence establishing that his support of Cadoura's claim was a "significant factor" in defendants' decision to place him on administrative leave and to not call him back from leave.  See *Barrett*, 245 Mich App at 315.  On the basis of Dr. Clark's opinions in his report that plaintiff was not fit for duty, Fire Chief Vack determined that plaintiff should remain on administrative leave.  Fire Chief Vack did not receive a report from a psychologist or a psychiatrist indicating that plaintiff was competent to return to work.  Accordingly, plaintiff was not called back to work.

Plaintiff argues that he was not timely informed of Dr. Clark's recommendations so that he could comply.  This argument is not supported by the evidence.  Although close, the temporal limitations had not expired when plaintiff was provided with Dr. Clark's report.  When confronted with this fact, plaintiff claimed that he could not afford to pay for the reevaluation.  But he also admitted that he was unsure whether he would have been required to pay for it.  Plaintiff additionally testified that he did not trust Dr. Clark and did not want to return to him.  Plaintiff also did not present any evidence that he attempted to comply with Dr. Clark's recommendation or that he requested an extension of the deadlines.  Instead, he opted to not take any action and was ultimately terminated for allegedly make false statements on his claim for unemployment benefits.

Plaintiff has failed to present sufficient evidence from which a fact-finder could reasonably infer that defendants' decisions to place plaintiff on administrative leave and to continue his leave had a retaliatory basis.  See *Rymal*, 261 Mich App at 303.  To the extent that the trial court concluded that plaintiff established a prima facie claim of retaliation under the ELCRA, we disagree because plaintiff failed to present sufficient evidence of a causal connection.  But our holding is the same: plaintiff failed to establish a genuine issue of material fact whether defendants had a legitimate reason to place him on administrative leave and to continue his leave.  Accordingly, the trial court did not err by granting summary disposition to defendants.[6]

Affirmed.

/s/ Sima G. Patel
/s/ Brock A. Swartzle
/s/ Philip P. Mariani

---

[5] For example, plaintiff suggests that the complaints and investigations that led to Fire Chief Vack ordering the psychological evaluation were all part of "witch hunts" orchestrated by the individuals that Cadoura had complained about.  But the investigations and resulting verbal warnings issued to plaintiff all occurred before Cadoura's deposition.  As discussed, plaintiff failed to present any evidence of his support of Cadoura's claim (i.e., the protected activity) that was known to defendants other than Cadoura's deposition.

[6] We will affirm a trial court's decision on a motion for summary disposition if it reached the correct result, even if our reasoning differs.  *Washburn v Michailoff*, 240 Mich App 669, 678 n 6; 613 NW2d 405 (2000).